*In re* APPORTIONMENT OF STATE LEGISLATURE—1965-1966.

BADGLEY *v.* SECRETARY OF STATE.

DECISION OF THE COURT.

1. STATES—APPORTIONMENT OF LEGISLATURE—DIVIDED COURT.
    Present plan of apportionment of legislature remains in effect, where Supreme Court is divided between remanding plan for further action by legislative apportionment commission and dismissal of petition to review plan that had been ordered to be adopted for previous elections (Const 1963, art 4, § 6).

---

REFERENCES FOR POINTS IN HEADNOTES
[1–3, 5–32, 34–41, 43, 45–51] 18 Am Jur, Elections § 13 *et seq.*
Inequalities in population of election districts or voting units as giving rise to a constitutional question—Federal cases. 93 L ed 11.
[4] 20 Am Jur 2d, Courts §§ 78, 79.
[33] 5 Am Jur 2d, Appeal and Error § 1009.
[42] 16 Am Jur 2d, Constitutional Law §§ 489, 491.
[44] 16 Am Jur 2d, Constitutional Law § 54.

MEMORANDUM.

BLACK, J.

2. COURTS — MANDATORY ORDER — LEGISLATIVE APPORTIONMENT BY
COMMISSION—CONTEMPT.

*A mandatory order of the Supreme Court to the legislative ap-
portionment commission to complete its work of districting
and apportioning the senate and house of representatives may
be enforced by requiring 7 of the 8 members, selected by lot,
to adopt a plan for review by the Supreme Court, or by an
order of contempt with an accumulatory daily fine of each
commissioner until the commission arrives at a final decision
(Const 1963, art 4, § 6).*

3. SAME—JURISDICTION—LEGISLATIVE APPORTIONMENT.

*Judicial enforcement is vital to the plan for apportionment of
the legislature as set forth in the Constitution wherein the
Supreme Court is accorded the power to determine which pro-
posed plan most accurately complies with the constitutional
requirements and its original jurisdiction to review, at an
elector's application, any final plan (Const 1963, art 4, § 6).*

4. SAME—SUPREME COURT—JURISDICTION.

*The Supreme Court has inherent as well as statutory power to
enforce its writ (CLS 1961, § 600.219).*

5. STATES—LEGISLATIVE APPORTIONMENT—SUPREME COURT.

*The mandate of the legislative apportionment provision of the
Constitution that the Supreme Court "shall direct the secretary
of State or the commission to perform their duties, may review
any final plan adopted by the commission, and shall remand
such plan to the commission for further action if it fails to
comply with the requirements of this Constitution" coupled
with the provision as to vesting of judicial power, and oath
of office for Justices requires responsible action forthwith by
the Supreme Court (Const 1963, art 4, § 6, art 6, § 1, art 11, § 1).*

6. SAME—APPORTIONMENT COMMISSION—BREAKING DEADLOCK.

*The secretary of the 8-member legislative apportionment com-
mission should be directed forthwith to select by lot 7 mem-
bers who are ordered to proceed within 30 days to district
and apportion the legislature, where the 8-member commission
has hitherto been deadlocked and there must be allowed time
for review of the action taken by the commission (Const 1963,
art 4, § 6).*

7. Same — Courts — Legislative Apportionment Commission — Standards.

> The task of the Supreme Court in the matter of legislative apportionment is limited to supervision and direction to the commission on legislative apportionment to the performance of its duties in accordance with applicable standards and provisions of the State Constitution and the equal protection clause requirement that both houses of a bicameral State legislature be apportioned on a population basis (US Const, Am 14; Mich Const 1963, art 4, § 6).

Separate Opinion for Remand.

Dethmers, J.

8. States—Apportionment of Legislature—Supreme Court—Remand to Commission.

> Majority action of Supreme Court in requiring legislative apportionment commission to complete its work according to applicable requirements of the Federal and State Constitutions held, indicative of shortcomings of plan theretofore ordered placed in effect for previous elections (US Const, Am 14; Mich Const 1963, art 4, § 6).

9. Same—Apportionment of Legislature—Courts—Equity.

> The Supreme Court's inherent equitable powers do not include the power to apportion legislative powers, the power to apportion the legislature being derived from the Constitution and limited thereby to review and to make determination with respect to a plan or plans emanating from members of the legislative apportionment commission (Const 1963, art 4, § 6).

10. Same—Apportionment of Legislature—Severance of Invalid Formulae.

> The fact that certain formulae which were included in the provisions of the Constitution for legislative apportionment have been found invalid does not preclude application of other standards set forth in the Constitution in determining whether any plan of apportionment meets, or most accurately meets, constitutional requirements (Const 1963, art 4, § 6).

11. Same—Apportionment of Legislature—Population—Census.

> The equal protection clause of the Federal Constitution, as interpreted by the Supreme Court of the United States, does not require apportionment of legislative districts as equal in population as the census permits but only that the districts shall be as nearly of equal population as is practicable (US Const, Am 14; Mich Const 1963, art 4, § 6).

12. SAME—APPORTIONMENT OF LEGISLATURE—POPULATION—BOUND-ARIES.

*Plan of legislative apportionment previously ordered adopted by Supreme Court for 1964 elections held, deficient in that it is excessively violative of Constitutional provision that districts be regular in shape and follow county, city, and township lines to the extent possible (Const 1963, art 4, § 6).*

13. SAME — APPORTIONMENT OF LEGISLATURE — POPULATION — OTHER STANDARDS.

*Plan of legislative apportionment whereby population variance was but slightly more than plan presently in effect held, to contain population as nearly equal as practicable within permissible limits of equal protection clause of the Constitution of the United States as construed by the Supreme Court of the United States and, since it complies most accurately with other standards in provisions of the State Constitution which should be observed, should replace present plan (Const 1963, art 4, § 6).*

SEPARATE OPINION FOR REMAND.

KELLY, J.

See headnotes 8–13.

14. DISCOVERY—POSSIBILITY OF ABUSE.

*It must be assumed that the right of discovery is involved in good faith in a proceeding to review plan of legislative apportionment and the Supreme Court can neither anticipate an abuse nor hold that possibility of abuse warrants inhibition of the right (GCR 1963, 302.4[2]).*

15. STATES — APPORTIONMENT OF LEGISLATURE — GERRYMANDERING — EVIDENCE.

*Proof of partisan gerrymandering of legislative districts should be permitted by Supreme Court in reviewing plan of legislative apportionment, since it is relevant and competent to enable the Court to determine whether the plan has resulted in malapportionment and gerrymandering for political advantage, as claimed by petitioner for review of plan previously ordered to be placed in effect (Const 1963, art 4, § 6; GCR 1963, 312-.4[2]).*

SEPARATE OPINION FOR REMAND.

O'HARA, J.

See headnotes 8–13.

SEPARATE OPINION FOR DISMISSAL.

SOURIS, J.

16. STATES — APPORTIONMENT OF LEGISLATURE — SUPREME COURT — EQUAL PROTECTION.

> *The invalidity of provisions of the State Constitution relative to apportionment of the legislature imposed upon the State Supreme Court responsibility for provisional reapportionment of the State's legislative power pending enactment of legislative or constitutional provisions for reapportionment in accordance with the requirements of the Federal equality clause as construed by the Supreme Court of the United States (US Const, Am 14; Mich Const 1963, art 4).*

17. SAME—APPORTIONMENT OF LEGISLATURE—7-MEMBER COMMISSION —CONSTITUTIONAL LAW.

> *Any judicially sired 7-member commission on legislative apportionment, selected by lot from 8-member commission provided by Constitution, designed to select a final plan for apportionment of the legislature held, without constitutional sanction (Const 1963, art 4, § 6).*

18. SAME—APPORTIONMENT OF LEGISLATURE—FINAL PLAN—COURTS— COMMISSION.

> *A plan of apportionment of the legislature which the Supreme Court has directed the deadlocked 8-member commission on legislative apportionment to adopt constitutes a final plan the same as though the plan had been one initially adopted by a majority of the commission, and the plan becomes law 60 days after publication and subject to an elector's challenge by proceedings for judicial review (Const 1963, art 4, § 6).*

19. SAME—APPORTIONMENT OF LEGISLATURE—COMMISSION—COURTS— MANDAMUS—CONTEMPT.

> *The judicial power of mandamus by the Supreme Court to order the commission on legislative apportionment and the secretary of State to perform ministerial duties in connection with the matter of legislative apportionment does not extend to compelling the commission to agree upon a plan other than one which the Supreme Court has directed the commission to adopt upon threat of an order of contempt bearing an accumulatory daily fine of each commissioner until the commission should arrive at a final decision with respect to a plan of apportionment (Const 1963, art 4, § 6).*

20. SAME—APPORTIONMENT OF LEGISLATURE—COMMISSION PLAN—RE-
VIEW BY SUPREME COURT.

*Any plan of apportionment of the legislature adopted by the
commission on legislative apportionment, even when ordered
by the Supreme Court, is reviewable by the Supreme Court
on the petition of an elector (Const 1963, art 4, § 6).*

21. SAME—APPORTIONMENT OF LEGISLATURE—SECRETARY OF STATE—
COMMISSION—COURT—MANDAMUS.

*An elector may apply to the Supreme Court for an order in the
nature of mandamus to compel the commission on legislative
apportionment to adopt a plan which the Supreme Court has
ordered the commission to adopt, in·view of provision authoriz-
ing the Supreme Court to direct the secretary of State or the
commission to perform their duties (Const 1963, art 4, § 6).*

22. SAME—APPORTIONMENT OF LEGISLATURE—PARTISAN GERRYMAN-
DERING.

*Fact that partisan gerrymandering of districts for the election
of State legislators has not yet been declared to present a re-
viewable Federal constitutional question by the Supreme Court
of the United States, would not bar consideration of such
claims by the State Supreme Court when ·properly · alleged by
a petitioner (Const 1963, art 4, § 6).*

23. SAME—APPORTIONMENT OF LEGISLATURE—PARTISAN GERRYMAN-
DERING—COURTS.

*The State may prescribe by constitutional or constitutionally per-
mitted legislative enactment, standards of apportionment of
the legislature designed to prohibit partisan gerrymandering,
but where there are no valid standards for such purpose, it is
not the province of the Supreme Court to supply them (Const
1963, art 4).*

24. SAME—APPORTIONMENT OF LEGISLATURE—PRESENT PLAN.

*Present plan for districting and apportioning State legislature, as
ordered by the Supreme Court to be adopted by the commission
on legislative apportionment held, to have formed districts as
compact, contiguous, and regular in shape and to have followed
county, city, and township boundaries as nearly as practicable
(Const 1963, art 4, §§ 1–6).*

25. SAME—APPORTIONMENT OF LEGISLATURE—SUFFICIENCY OF PETI-
TION FOR REVIEW.

*Petition for review of plan of legislative apportionment, adopted
by the · commission on legislative apportionment pursuant to
an order of the Supreme Court held, to be legally insufficient*

*to state a claim upon which judicial inquiry could be made, where complaint and offer of proof consists solely of conclusionary allegations of suspicion and speculation supported only by reference to election results allegedly achieved by partisan gerrymandering and a hope to discover facts through the process of discovery (Const 1963, art 4, § 6; GCR 1963, 302.4).*

26. SAME—APPORTIONMENT OF LEGISLATURE—GERRYMANDERING—DISCOVERY.

*Discovery was properly denied to petitioners, seeking to review plan of apportionment of legislature, who sought thereby to support allegations of partisan gerrymandering, where petitioners failed to submit an offer of proof of facts within their power to establish as distinguished from facts they hoped to discover (Const 1963, art 4, § 6; GCR 1963, 302.4).*

27. SAME—APPORTIONMENT OF LEGISLATURE—DUE PROCESS—ELECTIONS.

*Orders of State Supreme Court vacating previously adopted plan for districting and apportioning of State legislature and directing commission on legislative apportionment to adopt another plan irrespective of any challenge by an elector held, not to have been a denial of due process, because adopted 5 days after Supreme Court of the United States had construed the equality clause as requiring both houses of a bicameral legislature to be apportioned on a population basis as nearly as practicable, where State Supreme Court and commission had had various plans before them for many months and election timetable then required prompt action, and both commission and the Supreme Court have now considered the plan since its adoption (Const 1963, art 4, § 6).*

28. SAME—APPORTIONMENT OF LEGISLATURE—CORRECTION OF ERRORS.

*Mathematical or mechanical errors in apportionment of legislative districts in plan previously adopted should be corrected on review of the plan pursuant to electors' petition (Const 1963, art 4, § 6).*

29. SAME—APPORTIONMENT OF LEGISLATURE—CONSTITUTIONAL LAW—POPULATION—BOUNDARIES.

*Present plan for apportionment of State legislature, ordered by the Supreme Court to be adopted by the commission on legislative apportionment should not be abandoned for other plans which may provide less population differential between districts or otherwise enhance concern for shape, form, and boundaries, in absence of showing that prior adjudication of constitutionality was erroneous (Const 1963, art 4).*

30. SAME—APPORTIONMENT OF LEGISLATURE—EQUALITY OF POPULA-
TION—COUNTY BOUNDARIES.

*Plan of apportionment of legislative districts, required to be of
equal population as nearly as practicable would not be invalid
on the ground that such equality was too equal at the expense
of subordinate State standards, where if equality is approached
some county boundary lines must be breached and some districts
irregularly shaped (Const 1963, art 4).*

31. SAME—APPORTIONMENT OF LEGISLATURE—EQUALITY OF POPULA-
TION.

*Equality of population among legislative districts, as required
by the equality clause of the Constitution of the United States
as construed by the Supreme Court of the United States, neces-
sitates breaching some county lines in order to have a valid
plan of apportionment (US Const, Am 14; Mich Const 1963,
art 4, § 6).*

32. SAME—APPORTIONMENT OF LEGISLATURE—CURRENT PLAN.

*Plan of legislative apportionment as ordered by State Supreme
Court to be adopted by deadlocked commission on legislative ap-
portionment held, as corrected on electors' petition for review,
to meet all Federal and State constitutional requirements and
required to be followed for remainder of current decennium
or until such other time as may be provided by valid constitu-
tional amendment (Const 1963, art 4, § 6).*

33. COSTS—PUBLIC QUESTION—REVIEW OF PLAN OF APPORTIONMENT
OF LEGISLATURE.

*No costs are allowed in proceeding to review plan of apportion-
ment of legislature upon a petition by electors, a question of
public importance being involved (Const 1963, art 4, § 6).*

SEPARATE OPINION FOR DISMISSAL.

ADAMS, J.

34. STATES—APPORTIONMENT OF LEGISLATURE—REVIEW.

*Plan of legislative apportionment which had been ordered by the
Supreme Court to be adopted by the deadlocked commission on
legislative apportionment held, a final plan reviewable by the
Supreme Court on a petition by electors as provided in the
Constitution (Const 1963, art 4, § 6).*

35. SAME—APPORTIONMENT OF LEGISLATURE—SUFFICIENCY OF PETI-
TION—GERRYMANDERING—CONSTITUTIONAL LAW.

*Allegations in electors' petition to review plan of apportionment
of the legislature which Supreme Court had ordered commission*

*on legislative apportionment to adopt* held, *insufficient to state
a legal claim of gerrymandering (Const 1963, art 4, § 6).*

36. SAME—APPORTIONMENT OF LEGISLATURE—DUE PROCESS—ELEC-
TIONS.

*Orders of State Supreme Court vacating previously adopted plan
for districting and apportioning of State legislature and direct-
ing commission on legislative apportionment to adopt another
plan irrespective of any challenge by an elector* held, *not to
have been a denial of due process of petitioners, because adopt-
ed 5 days after Supreme Court of the United States had con-
strued the equality clause as requiring both houses of a
bicameral legislature to be apportioned on a population basis
as nearly as practicable, where State Supreme Court and com-
mission had had various plans before them for many months
and election timetable then required prompt action, and both
commission and the State Supreme Court have now considered
the plan since its adoption (Const 1963, art 4, § 6).*

37. SAME—APPORTIONMENT OF LEGISLATURE—EQUAL PROTECTION.

*Plan of legislative apportionment as ordered by the State Supreme
Court to be adopted by deadlocked commission on legislative
apportionment* held, *to comply with Federal equality clause as
construed by the Supreme Court of the United States (US
Const, Am 14; Mich Const 1963, art 4, § 6).*

38. SAME—APPORTIONMENT OF LEGISLATURE—PETITIONS—CONCLU-
SIONS. ·

*Conclusionary allegations in electors' petition to review plan of
apportionment of the legislature which State Supreme Court
had ordered commission on legislative apportionment to adopt*
held, *not statements of fact requiring vacation of the plan
(Const 1963, art 4, § 6).*

39. SAME—APPORTIONMENT OF LEGISLATURE—PETITION FOR REVIEW—
PLEADING.

*Substantial departure from State standards for apportionment
of the legislature must be shown in plan finally adopted for
·such purpose, where compliance with Federal equality clause
has necessitated less than full conformity with State standards;
and where such departure has not been pleaded by electors in
their petition for review, the plan is not successfully attacked
(Const 1963, art 4, § 6).*

40. SAME—APPORTIONMENT OF LEGISLATURE—ELECTORS' PETITION FOR
REVIEW—DISCOVERY.

*Discovery of motivations, cogitations, and machinations of the
members of the commission on legislative apportionment, even*

*if available, would be irrelevant in proceeding by electors to review plan of apportionment of legislature, as only the plan is the subject of review, all proceedings of the commission are open, public records, and official census figures and election precincts, political and geographic boundaries are matters of which the Supreme Court takes judicial notice (Const 1963, art 4, § 6).*

SEPARATE OPINION FOR DISMISSAL.

T. M. KAVANAGH, C. J., and SOURIS and SMITH, JJ.

41. STATES—APPORTIONMENT OF LEGISLATURE—EQUAL PROTECTION.
*The equal protection clause of the Constitution of the United States, as construed by the Supreme Court of the United States with respect to districts from which legislators in both houses of a bicameral legislature are elected, and requiring that they be of as nearly equal population as practicable, has been found by a majority of the Justices to have been complied with in the plan of apportionment ordered by the State Supreme Court to be adopted by the commission on apportionment and published (US Const, Am 14; Mich Const 1963, art 4, § 6).*

42. CONSTITUTIONAL LAW—SUPREMACY CLAUSE—EQUAL PROTECTION.
*The interpretation by the Supreme Court of the United States of the equal protection clause of the Constitution of the United States is, by virtue of the supremacy clause, deemed to be a part of the State Constitution (US Const, Art 6, § 2; Am 14).*

43. STATES—APPORTIONMENT OF LEGISLATURE—CONSTITUTIONAL LAW.
*The "constitutional requirements" test of the State Constitution by which the State Supreme Court must measure a plan of apportionment of the legislature includes relevant Federal constitutional requirements, such as the equality clause as construed by the Supreme Court of the United States (US Const, Art 6, § 2; Am 14; Mich Const 1963, art 4, § 6).*

44. CONSTITUTIONAL LAW—CONSTRUCTION OF CONSTITUTION.
*Federal and State constitutional requirements are construed and applied together when in harmony, but when in disharmony, the Federal requirements are overriding (US Const, Art 6, § 2).*

45. STATES — APPORTIONMENT OF LEGISLATURE — SUPREME COURT — CONSTITUTIONAL LAW.
*The Supreme Court's declaration that present plan of apportionment of the legislature is not unconstitutional is the same as declaring the plan constitutional (Const 1963, art 4, § 6).*

46. SAME—APPORTIONMENT OF LEGISLATURE—CONSTITUTIONAL LAW.

*The failure first to find present plan of legislative apportionment was invalid as not complying with the requirements of the State Constitution precludes consideration of other plans offered by members of the commission on legislative apportionment after remand (Const 1963, art 4, § 6).*

47. SAME—APPORTIONMENT OF LEGISLATURE—POPULATION BASIS—DEVIATIONS.

*A faithful adherence to a plan of population-based apportionment of the State legislature with such minor deviations only as may occur in recognizing factors that are free from any taint of arbitrariness of discrimination must be used in a plan of apportionment (Const 1963, art 4, § 6).*

48. SAME—APPORTIONMENT OF LEGISLATURE—MATHEMATICAL RIGIDITY OF FORMULAE—POPULATION DISPARITIES.

*Plans for apportionment of legislature, presented by individual members of commission on legislative apportionment and so designed as to permit a maximum percentage variation from mathematical average, even if up for consideration on electors' petition to review plan hitherto adopted, held, unconstitutional because of mathematical rigidity of formulae and because of gross population disparities between districts (Const 1963, art 4, § 6).*

49. SAME—PARTISAN GERRYMANDERING—FEDERAL QUESTION.

*Partisan gerrymandering of legislative districts has not been condemned as such as unconstitutional by the Supreme Court of the United States, no Federal question having yet been found to be presented thereby.*

50. SAME—APPORTIONMENT OF LEGISLATURE—FINAL PLAN.

*Plan of apportionment of the legislature as heretofore found to have complied with constitutional requirements and directed by the Supreme Court to be adopted and published and again reviewed on electors' petition held, a final plan which, with minor errors corrected, should be followed in subsequent elections until the next decennial reapportionment or as may be required by constitutional amendment (Const 1963, art 4, § 6).*

51. COSTS—APPORTIONMENT OF LEGISLATURE—DISMISSAL OF ELECTORS' PETITION.

*No costs are allowed on dismissal of electors' petition to review plan of apportionment of legislature which Supreme Court had ordered commission on legislative apportionment to adopt after majority of commission had failed to agree upon any plan (Const 1963, art 4, § 6).*

See 376 Mich 410 and 481–483.   Submitted May 11, 1965.   (Calendar No. 19, Docket No. 50,999.) No plan adopted by commission on legislative apportionment after expiration of 60 days from November 2, 1965.   Certificate of Secretary of State filed January 4, 1966, informing Court that commission had not adopted a plan.   Cause considered upon previous order retaining jurisdiction.   Petition by William H. O'Brien and others acting for Civic Searchlight, Inc., asking right to intervene or, in the alternative, to file brief *amici curiae,* denied.   Original petition not granted March 8, 1966, the Supreme Court being divided between immediate mandate to commission to complete its duties by functioning through 7 members of the commission chosen by lot, if necessary, and for prompt review of such action, per BLACK, J.; remand of matter to commission for adoption of another plan, per DETHMERS, KELLY, and O'HARA, JJ.; and dismissal of petition, per T. M. KAVANAGH, C. J., SOURIS, SMITH, and ADAMS, JJ.   Application for leave to appeal dismissed by Supreme Court of the United States November 21, 1966; rehearing denied January 9, 1967.

*Dykema, Wheat, Spencer, Goodnow & Trigg* (*Nathan B. Goodnow* and *James D. Tracy,* of counsel), for plaintiffs.

*Frank J. Kelley,* Attorney General, and *Robert A. Derengoski,* Solicitor General, for defendant Secretary of State.

*Rothe, Marston, Mazey, Sachs & O'Connell* (*Theodore Sachs,* of counsel), for intervenor defendants.

*Stanley E. Beattie,* for petitioners O'Brien and others denied right to intervene or file brief *amici curiae.*

MEMORANDUM OF JUSTICE BLACK (*for issuance of immediate mandatory writ; submitted to other members of the Court January* 17, 1966).

"We have a great problem here maintaining our credibility with our own people."[1]

As this constitutionally ordained original proceeding draws to an ignominious close, the Supreme Court of Michigan also has a great problem maintaining its credibility with its own people. We have issued a mandatory order to the commission on legislative apportionment, the purposeful integrity of which five of us have attested "pursuant to the specific mandate which appears in paragraph 8 of said section 6"[2] (376 Mich at 481). The time allowed for performance has expired, and the commission has refused to comply. Now, without plausible explanation or excuse, the Court will not set in motion any one of the several means of enforcement to which it may and should exigibly turn.[3] In blunt short, the Court will not execute a pivotal assignment of the Constitution; the paragraph 8 assignment to assure the people that the commission "performs" its paragraph 5 duty.[4]

Since an ultimate negative end of the captioned proceeding is directly ahead, and since the proceeding is of such public nature as to render it beyond settlement or compromise, I have concluded that

---

[1] Ambassador Goldberg; quoted by James Reston in the Detroit Free Press January 8, 1966.

[2] Const 1963, art 4, § 6.—REPORTER.

[3] One, the most immediately effective means of persuading the commission to terminate its deadlock, was written into our record November 2 (376 Mich at 445, 446). And if that method is too strong for those who cannot stand the sight of political blood, another to which the Court might turn would be an order of contempt bearing an accumulatory daily fine of each commissioner until the commission arrives at a "final decision" under paragraph 5 (of said section 6).

The daily fine would have to be high in amount of course. The stakes of action versus inaction under said section 6 are coveted politically. The monetary value thereof is dear unto priceless.

[4] Const 1963, art 4, § 6.—REPORTER.

the fact should be announced now, the better to
relieve such uncertainty as may yet remain in the
minds of governmentally concerned citizens.   No
agony, even of political nature, should be prolonged
unnecessarily.   Today's divisively fragmented cir-
cumstances reviewed, it is in order that the legisla-
ture be told immediately that it may get on with
its critically requisite task of legislation; that there
need be no further suspensory concern for affirma-
tive judicial action; that the commission has demitted
and the Court will do nothing about it.[5]

This appeal to our original jurisdiction is dead.
All is over except the bandying of words about and
around another fervent plea for deliverance of the
Court by constitutional amendment (see Justice
SOURIS, 376 Mich at 466–469).   The Court should say
so, now in January, rather than dally along with
dissentient obliques only to belatedly admit the fact
next spring.   All protestations, denials and side-
winded delaying actions to the contrary notwith-
standing, the Court for want of a majority vote will
not enforce its order of November 2d.   Without
judicial enforcement section 6 is lifeless.   That part
of article 4, upon which the whole article was de-
signed to pivot now and decennially hereafter, is
backbone paralyzed.   Some day prior to the 1966
cutoff date we knew in 1964 (373 Mich at 253), the
Court will deliver its *beau geste* to the presently
districted legislature.   It will descend ambagiously
from the third to the second floor of the Capitol
in the form of an exalted beatitude, *beati possidentes*
(blessed are those who possess).

---

[5] If this timid "writ of arousal" should galvanize the Court into
timely pursuit of what section 6 calls for judicially, I shall promptly
write into our record an *amende honorable.*   Predictably, though, no
crow will be set at my place on our conference table.   The bird must
be brought down first—quick too—and I see no quaternity of marks-
men here.

The prerogative "writ of arousal" was invented by Justice KELLY.
See Former Justice TALBOT SMITH in 51 ABAJ at 1053.

Memorandum by BLACK, J., for MANDATORY WRIT.

Woven through every word so far written *in re* this appeal to our original jurisdiction is a little matter known as the truth that must be served. It is that our order of November 2d *can* be enforced by the Court, provided the Court has the will to enforce it. To say upon authority of section 6 that the Supreme Court of Michigan, "in the exercise of original jurisdiction," may — no "shall" — direct the commission to perform its duties (that we have done; 376 Mich at 481, 482), and then to say or imply that the Court cannot enforce its writ, is to deny what is inherent as well as statutorily provided.[6] Significant too is the fact that no member of this Court is willing to stand up, on the record, with averment either that section 6 is invalid or that the people, by that section, *have written into their Constitution a mandate no branch of the State government can enforce.* The only exception is Justice SOURIS (see 372 Mich at 461–469; 373 Mich at 257–262; 376 Mich at 458). He says section 6 is unconstitutional; not that the Court is powerless to enforce it.

. I stand apart from such judicial delinquency. The Court fails to attend the Constitution with that resolution which, to the people of Michigan, has been due since the first Monday of 1966. Its failure is sure to rise and haunt the Court, again in 1971, when the decennial census of 1970 is recorded and the duties of a newly appointed commission and of the Court are called into play anew under section 6.

The only way to avoid such recurrence is by an intervening amendment of the Constitution. But even that avenue of retreat from duty may not be

---

6 "Sec. 219. The Supreme Court has a general superintending control over all inferior courts and tribunals. The Supreme Court has authority to issue any writs, directives, and mandates that it judges necessary and expedient to effectuate its determinations, and to take any action it deems proper to facilitate the proper administration of justice." (CLS 1961, § 600.219 [Stat Ann 1962 Rev § 27A.219]).

open. When the question of 10-year party control of the legislative branch is at stake in the critical wording of a constitutional clause to be proposed, the internecine fury of the drafting committee or committees is more than likely to result in another political deadlock, with all participants on the floor. And if by some chance the drafters should come up with what they might agree to submit for consideration of the electorate, will enough electors approve it, realizing as all will from these telltale experiences of 1965–1966 that there will be *no way to insure the enforcement of what they are asked to indorse?*

TO CONCLUDE:

1. The provisions of section 6 are judicially enforcible. *There is no person, court, tribunal, or branch of government to which this Court may pass the politically heated buck.* Something more than power is cast upon this Court by the final paragraph of section 6, conjoined as that section is with the first section of article 6 and the oath each seated Justice has subscribed with uplifted hand.[7] There is the honor of duty, prefaced by that verb "shall." It is aimed at the very navel of the Court by that final paragraph of section 6.

2. Current criticism of section 6, spawned of this second deadlock of the commission, is aimed at the wrong target. The fault lies not with the section but with the judicial branch. Section 6 was a well thought out procedural solution of what is probably the most difficult of all problems of organization of State legislative assemblies. So far as I can discover,[8] it is the only constitutionally provided

---

[7] See Const 1908, art 16, § 2; Const 1963, art 11, § 1.—REPORTER.

[8] The nearest to section 6 constitutional procedure so far effected was approved last Friday (January 14, 1966) by the electors of Missouri. Sections 2 and 3 of the Missouri amendment to article 3 deal with apportionment of the house of representatives. Sections 5 and 7 of the amendment to article 3 deal with apportionment of the senate. Excepting for interchangeable reference to the "senate,"

means extant for districting and apportionment of a State legislature under explicitly directed judicial supervision. But again, as is ever the case where enforcement of a constitutional mandate is required, the mandate is no stronger than the agency assigned to its enforcement. The human element is ever the weak link. That is why, on sad occasion, that

> "The best laid schemes o'mice and men
>     Gang aft a-gley,
> An' lea'e us nought but grief and pain,
>     For promis'd joy."[9]

3. As the Court, by inaction, releases this particular commission from duty forever, some citizens surely (the writer being one) will find themselves giving a wry salute to the four Democratic divinators of the commission. The prescience that foursome has shown is wondrously uncommon. How the four could have been so confident, in those waning days of December, that five members of the Supreme Court of Michigan would not enforce what the five ordered the commission to do, back in early Novem-

---

"senators" and "senatorial districts," the relevant provisions of sections 5 and 7 duplicate in full substance the following portions of said sections 2 and 3:

"After the statement [final apportionment statement with required map, approved by the commission] is filed members of the house of representatives shall be elected according to such districts until a reapportionment is made as herein provided, except that if the statement is not filed within 6 months of the time fixed for the appointment of the commission, it shall stand discharged and the house of representatives shall be apportioned by the commissioners of the State supreme court, a majority of whom shall sign and file its apportionment plan and map with the secretary of State within 90 days of the date of the discharge of the apportionment commission. Thereafter members of the house of representatives shall be elected according to such districts until a reapportionment is made as herein provided. * * *

"In the event the commissioners of the State supreme court are charged with the apportionment of the house of representatives, they shall file their plan of apportionment and map with the secretary of State within 15 days of the discharge of the commission."

Now what will the Missouri supreme court do should the six commissioners of that court arrive at a deadlock? Follow our inaction as precedent? Come now, Brothers.

9 Robert Burns, "To a Mouse," stanza 7.

ber, can be attributed only to occult power; a power given to few mortals. These gentlemen, by standing firm for the *status quo* through every painful hour of that 60-day period, predictably have saved the presently districted legislature, probably for all currently foreseeable time. Their spiritual (not political of course) rewards should be of high order.

Our mandatory writ should issue forthwith, requiring that the secretary of the commission proceed promptly[10] to insert, say in a jury box borrowed from a nearby circuit court, eight uniformly folded white slips of paper bearing respectively the names of the eight members of the commission; that he then close the box and shake it up as county clerks are wont to do upon jury selection; that he then, with discreetly averted gaze, draw out seven of the slips one after the other; and that he announce after each withdrawal the name appearing on the withdrawn slip.

A separate and simultaneously issued writ should direct that the first seven members of the commission, identified thus by the seven withdrawn slips, shall "proceed to district and apportion the senate and house of representatives" within an allotted number of days, say 30, and should provide for prompt review of the action of the seven commissioners upon petition filed in the present proceeding by any elector; all in pursuance of paragraph 8 of said section 6 and paragraph 2 of our said order of November 2d.

No one need despair, or flee to the hills should such an order issue. Whatever the result of any such 7-man commission action, that result would be subject to constitutional test pursuant to said paragraph 8. And even though such mandated procedure might, the time element again being critical,

---

10 After due publication and certainly in a public place.

leave the Austin-Kleiner plan intact for the elections of 1966, this Court would be able to say that it had performed manfully the duty said paragraph 8 has imposed upon it. "Drest" only as we are "in a little brief authority,"[11] it might even be said of us some day that such was *our* finest hour.

*SUPPLEMENT* (February 1, 1966):

In the great journal of things happening since section 6 was first invoked in this Court (February 4, 1964; 372 Mich 418) we find that our paragraph 8 time-account is running out. It is fitting that the journal not be closed and put away until all of the other members of the Court have doffed hats to Justice Souris. Even though he received no support November 2d last, our Brother has succeeded veritably in achieving the aim of that motion to "adjourn further proceedings in this matter until February 15, 1966, or until the further order of this Court" (376 Mich at 469); a motion he has followed today by a motion to dismiss this constitutional proceeding. It is perfectly clear, now that February has arrived, with no open or preparatory judicial action in the meantime,[12] that the Court and the

---

[11] Shakespeare, Measure for Measure, act 2, scene 2.

[12] See paragraph "2" of our order of November 2, 1965 (376 Mich at 482). In accordance with that paragraph the secretary of the commission advised the Court, on January 4, 1966, that the commission "was deadlocked and unable to agree upon a plan for the apportionment of the Michigan legislature." His report concluded with a prayer for entry of a "further mandatory order in this cause."

On January 12, 1966, the Court met for the purpose of considering "what to do" about the commission's intransigeance. Since then the Justices have engaged busily upon the business of writing opinions for a variety of tort, zoning, workmen's compensation, contract, contempt, public service, malpractice, and like matters of less pressing concern. But nary a written or spoken word about this time-emergent proceeding, affecting as it does the very future of the government of Michigan, has since been scrawled or communicated to other members of the Court. The only exception is the foregoing memorandum of January 17, 1966 and now today's motion—by Justice Souris—to throw this constitutional proceeding right out of Court. "Adjourn it first, and then dismiss it later." There is the explanatory key to this whole sordid business.

commission have left but a scant 4 months within
which to complete, *with finality,* what section 6 calls
for.  That isn't enough, further delays being expect-
able.  Justice SOURIS' said motion to adjourn, even
though denied at the time, has flowered into subtile
—not subtle—effectiveness.  The Austin-Kleiner
plan, which this Court made effective for the 1964
legislative elections only, never a "final plan" within
said section 6, is assured full effectiveness for the
1966 legislative elections.

Courts many times, by the negation of advertent
or inadvertent procrastination, accomplish affirma-
tive results.  It is so here.  Even though there should
be an immediate change of majority heart, it is
predictably impossible to fulfill all of the require-
ments of paragraph 8 prior to the June deadline.
(March 8, 1966):

Now that the foregoing memorandum has roused
other members of the Court into written-for-the-
record contribution of their respective views and
decisions, two things stand forth.  The first is that
Justice SOURIS, departing from his previously stead-
fast declaration that section 6 is *unconstitutional*
(372 Mich at 461–469; 373 Mich 257–262; 376 Mich
at 458–469), has joined three other members of this
eight-man Court in the *final* selection, under para-
graph 7 of that same allegedly unconstitutional sec-
tion 6, of the Democratic (Austin-Kleiner) plan.
The second is that the now united four (Justices
SOURIS, T. M. KAVANAGH, SMITH, and ADAMS) stand
for final dismissal of this paragraph 8 original pro-
ceeding.[13]

---

[13] A less timid and less respectful judge than the undersigned
described a similar denouement in *State, ex rel Lashly,* v. *Becker,* 290
Mo 560, 625 (235 SW 1017, 1041, 1043); another closely divisive
apportionment case.  Here are his words of summary:

"Shackled as we are with partisan bias and prejudice, it is humiliat-
ing to confess that even judges in our highest courts are unable to

This quaternary joinder is of course presently decisive. By deadlock here the deadlocked commission on legislative apportionment is no more. Nonetheless, being philosophic by nature, I am moved to say that what has thus come to pass is better than more judicial stalling. It amounts at least to a "decision" by impasse.

Ever since this paragraph 8 original proceeding was submitted last May the Court has dallied over a "decision" just about anyone, having a near or distant connection with the Capitol's moccasin telegraph, could have predicted. Turning away from its paragraph 8 duty to see that the commission performs its duty; that of adopting a "final plan" of districting and apportionment; the Court itself— by stalemate—has proceeded "to district and apportion the senate and house of representatives," thus effecting its own "final plan."

From all this I expressly abstain. My reasons appear in the 376th Michigan report at 440–451.[14]

divorce law and politics. In emergencies, great and small, they have heard the Macedonian cry, and have not been disobedient to the call.

"What avails a constitution if it can be stricken down by mere inference and, as many believe, in the interests of partisan politics? Such a conclusion should be announced only when good and substantial reasons can be given therefor that will appeal to the common sense and understanding of our people. Mere sophistry and attenuated theories will not serve the purpose nor save us from reproach."

I cannot go that far, goodness, mercy, charity, and credulity being dominant in Michigan; whereas servient in Missouri. As before, "it must be said again that the Supreme Court of Michigan is loftily separated from partisan politics." (376 Mich at 448.) What the Justices write now, distinguished from past writings and indorsements of writings, they sincerely believe. They have thought this all out in what Justice Cardozo described as the "realm of pure reason." The contexture (Nature of the Judicial Process, p 168):

"I do not doubt the grandeur of the conception which lifts them [judges] into the realm of pure reason, above and beyond the sweep of perturbing and deflecting forces. None the less, if there is anything of reality in my analysis of the judicial process, they do not stand aloof on these chill and distant heights; and we shall not help the cause of truth by acting and speaking as if they do."

[14] "I hold (a) that it is the constitutionally *exclusive* duty of the commission on legislative apportionment to district and apportion

This is not a paragraph 7 proceeding. If it were, then (this is for future reference only) my vote would be cast with Justice DETHMERS in support of plan No. 5. When my unreserving support of the words that follow immediately was recorded last November 21st (376 Mich 483), I meant every bit of that support. The words, written by Justice ADAMS (376 Mich at 457):

"Though the Federal standards are overriding and must be followed, I see no reason why the standards and provisions in our own State Constitution should not also be applied if it is possible to do so. I do not regard the failure of the 80–20 formula as having destroyed these standards. The commission should apply them, if at all possible, always remembering that the United States Supreme Court said:

" 'We hold that, as a basic constitutional standard, the equal protection clause requires that the seats in both houses of a bicameral State legislature must be apportioned on a population basis.' *Reynolds* v. *Sims,* 377 US 533, 568."

When the Austin-Kleiner plan and said plan No. 5 are arrayed together for paragraph 7 choice ("which plan complies most accurately with the constitutional requirements"), there is no contest. Austin-Kleiner by express admission of Justice SOURIS (*post* at p 433) discloses a serious defect; a defect the Justice would cure by judicial fiat. Plan No. 5, on the other hand, preserves what sections 2 and 3 of article 4, of the Constitution of 1963, call for consistently with our own equality clause (article

the senate and house of representatives; (b) that that duty cannot, under said paragraph 8 or otherwise, be taken over by this Court without violating the plain directions which appear in said section 6 of article 4; (c) that the commission on legislative apportionment has not as yet performed its duty for the entire remainder of the present decennial period, and (d) that it is our peremptory responsibility under said paragraph 8 to instruct the commission as follows"; (376 Mich at 444).

1, § 1) as well as the equality clause of the Fourteenth Amendment.

True, neither of the two plans is constitutionally perfect. No plan has to be when a paragraph 7 choice is in order. The reason is that next ensuing paragraph 8 stands ready to correct, by "review" if called upon, any "final plan" the commission adopts pursuant to paragraph 5 of said section 6. Did not the delegates, and in turn the people, put paragraph 8 *after* paragraph 7, in said section 6, for that very *final* purpose?

DETHMERS, J. (*for remand to the commission*). On May 26, 1964, Justices SMITH and ADAMS joined Justices KELLY, O'HARA, and me in approving the Hanna-Huhtala-LaPorte-Brucker plan of apportionment as complying most accurately with article 4 of the Michigan Constitution of 1963. *In re Apportionment of Legislature—1964*, 372 Mich 418, 480, 482. This involved disapproval of the Austin-Kleiner plan, then also before this Court, for lack of such accurate compliance. Pursuant thereto an order of this Court issued that same day directing the adoption of the Hanna-Huhtala plan by the apportionment commission. Thereafter, the Supreme Court of the United States spoke in *Reynolds* v. *Sims*, 377 US 533 (54 S Ct 1362, 12 L ed 2d 506), requiring apportionment of both houses of State legislatures to be on a population basis with districts as nearly of equal population as is *practicable*. There followed two orders of a majority of this Court on June 17, 1964, the first vacating the May 26th order, and the second, a companion order, directing the commission to reconsider the apportionment matter in the light of the decision in *Reynolds*. *In re Apportionment of State Legislature—1964*, 373 Mich 247. Next, upon the com-

mission reporting its continued inability to get a
majority in agreement on a plan and its members
submitting plans, including again the Austin-Kleiner
plan, four members of this Court on June 22, 1964,
filed an opinion finding that that selfsame Austin-
Kleiner plan most nearly complied with the Federal
constitutional requirement announced in *Reynolds*.
*In re Apportionment of State Legislature*—1964, 373
Mich 250.  In that opinion it is said concerning the
Austin-Kleiner plan that (pp 253, 254):

"By such plan districts in both the senate and
house of representatives are composed of territory
containing population as equal as the 1960 Federal
decennial census permits.  Subject to this controlling
objective of substantially equal population, and to
the extent it would not be subordinated, districts by
such plan are formed as compact, contiguous, and
regular in shape, and do follow county, city, and
township boundaries as nearly as practicable."

This opinion was signed by four Justices—T. M.
KAVANAGH, Chief Justice, and Justices BLACK, SMITH,
and ADAMS.  It directed that the commission adopt
the Austin-Kleiner plan and that it be placed in
effect for the 1964 elections.  Justices O'HARA and
SOURIS concurred in the result, apparently basing
their concurrences solely on Federal grounds.

All of the above ostensibly occurred under the
provisions of the seventh paragraph of article 4,
§ 6, Michigan Constitution of 1963, the commission
having reported an inability to agree and individual
members or groups of members having submitted
different plans to the Court.  The last noted order
of this Court was complied with by the commission
and thus was the Austin-Kleiner plan adopted and
published.

There followed the filing of the petition in this
case by electors, under the eighth paragraph of

section 6, article 4, seeking review by this Court of the adopted Austin-Kleiner plan.

On November 2, 1965, a majority of this Court, in this cause, ordered the commission to proceed anew with consideration of plans to enable it to apportion according to requirements of the Federal and State Constitutions and this Court retained jurisdiction. (376 Mich 481.) A majority previously (June 22, 1964) having held that Austin-Kleiner most nearly complies with the population equality requirement of the Federal Constitution, this Court's majority action of November 2, 1965, is indicative of that plan's considered shortcomings insofar as compliance with requirements of the State Constitution is concerned.

Query well, whether this return to the commission is to be considered as placing the proceeding back in paragraph 7 or in paragraph 8 status. At all events, the commission again failed to reach majority agreement and, upon their report, back comes Austin-Kleiner urged upon the Court by the Democratic commissioners and a so-called house and senate plan No. 5 by the Republican commissioners. Whether, under either express or inherent retention of jurisdiction in the November 2, 1965, direction of the matter anew to the commission, this is still in the posture of a paragraph 7 matter with no commission majority in agreement, thus calling for determination by this Court of which plan submitted by members of the commission most accurately complies with constitutional requirements, or has now matured into paragraph 8 stature in which this Court shall direct performance of duties by the commission and secretary of State, review the adopted plan and shall remand to the commission if the plan *"fails to comply with the requirements of this Constitution"*, the practical result is the same. We review the Austin-Kleiner plan. Then we may, as

under paragraph 7, determine whether the Austin-Kleiner or No. 5 or any other plan submitted by members of the commission most accurately complies, or, as under paragraph 8, determine whether adopted Austin-Kleiner fails to comply and, if so, remand it to the commission for further action. In doing the latter, methinks it would be permissible, indeed requisite, for the Court to at least whisper in not too inaudible tones, that plan No. 5 or some other submitted by a commissioner more accurately complies. For all practical purposes, then, we are on familiar ground.

At this juncture, I should interject that I consider one or the other of the last two above courses to constitute the sum total of our powers in the premises. I do not subscribe to the idea of inherent equitable powers in the Court to apportion legislative powers. Such was never the concept in English or American law. Our powers in the matter must derive from the Constitution. It expressly provides in article 4 for powers of apportionment, the manner of their exercise and by whom. The Court is not therein designated as an apportioner. Neither do powers vested in the Court elsewhere in the Constitution include such power. I reject the idea that we have power in the matter to order a plan of apportionment of our own devising or to choose from sources other than plans the commission or some one or more of its members officially submit to this Court under article 4. There is imposed upon us, then, the heretofore mentioned function and task to review and make determination with respect to a plan or plans emanating from members of the commission.

Some of the members of this Court holding the 80–20 formula and the .7% formula specified in article 4 for apportioning the Senate and House, respectively, unconstitutional as violative of the Federal

Constitution's Fourteenth Amendment equal protection clause, have written that other standards for apportionment set forth in section 6 of article 4 are not severable from the mentioned formulae provisions and, therefore, cannot survive the holding of the latter's invalidity. From this it is argued that there are, then, no valid State constitutional standards against which to judge Austin-Kleiner's validity. This nonseverability contention I do not accept. Mr. Justice Black, in his opinion of November 2, 1965, reported in 376 Michigan at page 440, *et seq.*, has expressed his reasons for rejecting such claim. I agree therewith. It seems to me that it is completely possible for some or all of the other standards or requirements of article 4, § 6, to stand and be made effective even though the formulae be eliminated from the determination of apportionment. If the Federal Constitution's Fourteenth Amendment equal protection clause, as says the United States Supreme Court in *Reynolds,* requires population equality between districts as nearly as practicable, and if this bars the intent of a majority of Michigan voters, in adopting the Constitution, to cause area and geographical considerations to temper or dilute population standards by use of the formulae, does it follow that the people, because frustrated in that formulae attempt, would peevishly refuse anything less and that, thus, they would reject or scorn any of the other standards, already adopted by them, that tend to give some meaning to area or geographic considerations in the final, net total apportionment solution? To pose this question makes manifest the ridiculous character of such a suggestion. Those standards survive *Reynolds.* The nonseverability theory ought not to be permitted to be a barrier to determination of the problem before us of whether Austin-Kleiner meets State constitu-

tional requirements or which plan, if any, most accurately does.

As previously noted, the finding, if such it may be called, of a majority of this Court on June 22, 1964, with respect to Austin-Kleiner was that it complied most nearly with the Federal Constitution's Fourteenth Amendment requirement as to population. None said that it was the plan which complied most accurately with article 4, § 6, Michigan Constitution of 1963 requirements which continue to exist aside from the formulae. While, as above noted, the four-Justice opinion of June 22, 1964, did comment that the Austin-Kleiner plan formed districts as "compact, contiguous, and regular in shape, and do follow county, city, and township boundaries as nearly as practicable", it is to be observed that this statement is prefaced by the expression which reveals that it is premised on the consideration that the plan's controlling objective is that of attaining districts "containing population as equal as the 1960 Federal decennial census permits." Thus, any comfort for the suggestion that the finding is made in that opinion that Austin-Kleiner complies most accurately with the Michigan Constitution is based on the false premise that the Federal Constitution and *Reynolds* require apportionment into districts containing population as equal as the census permits. *Reynolds* does not go to such extremes, but provides only that the districts shall be as nearly of equal population as is *practicable.* So read and understood, it is clear enough that no majority or portion of this Court has held that Austin-Kleiner complies most accurately with article 4 of the Michigan Constitution. As also previously noted, on May 26, 1964, a majority of this Court, still members of this Court, held that Austin-Kleiner was not the plan which so complied. Nothing has since been written by any of them, or any other Justice of this

Court, to demonstrate that Austin-Kleiner did, after all, most accurately comply. Instead, it is written that the plan, Austin-Kleiner, adopted on order of this Court, must bear the presumption of constitutionality, that petitioners in this proceeding bear the burden of establishing the unconstitutionality of the adopted Austin-Kleiner plan, that they have not borne it and, in fact, have not even pleaded facts to prove it, and hence the proceedings should be dismissed for such failures by petitioners. This completely misconceives the nature of this proceeding and the function and duty laid upon this Court by article 4 of the Michigan Constitution. If adoption of a plan by the commission, either of itself or under order of this Court, gives the plan the benefit of such presumption and a burden of proof rests on petitioners, there would be scant purpose for providing, as does paragraph 8, for review upon petition of any elector and for Court determination of whether the plan fails to comply. The purpose was and manifestly is to secure apportionment in compliance with the Constitution, not to provide for a match of wits and skills in an adversary proceeding. The duty of the Court is not satisfied nor discharged by a mere determination of the adequacy of petitioners' pleadings, nor the sufficiency of their proofs (which it is said are insufficient, in the face of a majority of this Court's constant denial of their petition for discovery to help develop such proofs), but, on the contrary, the duty of this Court is to make a finding as to constitutional compliance and, if found that the plan fails in that respect, to remand it. The test is not the character, quality, and skill of petitioners and their efforts, but, rather, of the plan itself. That is the question for our answer and should meet with no avoidance on the basis of technicalities or otherwise. Does Austin-Kleiner

meet the permissible, surviving requirements of article 4?

The word of a majority of this Court, expressed in official opinions, as above observed, was that Austin-Kleiner did not so comply. What has since been shown or discovered to the contrary? Nothing to that effect has been called to our attention. The briefs and statements submitted to this Court in this matter by those commissioners who are proponents of Austin-Kleiner display such a surprising knowledge of and avid interest in figures which they allege represent the relative number of Republican and Democratic senators and representatives who will be elected to the State legislature, on the basis of the vote cast for State treasurer in 1962, under the different plans, as to weaken considerably their vehement protestations of having given no regard thereto in devising Austin-Kleiner. A look at the plan does as much. To what a majority of this Court once announced on the point, I continue to give adherence. Austin-Kleiner is excessively violative of the permissible, surviving requirements of article 4, § 6, in the respects heretofore mentioned in opinions of members of this Court, such as that of this writer appearing at 373 Mich 256 in which, in comparing Austin-Kleiner to another plan, Austin-Kleiner was found deficient with regard to the requirements "of creating districts of regularity in shape, following, to the maximum extent possible, county, city and township lines, with due regard for the integrity of the boundaries thereof." Examination of the Austin-Kleiner plan, with tables, maps, and supporting materials will disclose the extent of the failure of compliance. We find Austin-Kleiner to be invalid and unconstitutional.

The materials in the files relating to house and senate plans No. 5, as amended with respect to

senate district No. 36,* disclose a greater compliance with the surviving standards of article 4, § 6: It is the plan which complies most accurately with those constitutional requirements.

It is pointed out by the commissioners who are the Austin-Kleiner proponents that it presents districts more nearly of equal population than do plans No. 5. Attention must again be directed to the fact that *Reynolds* does not require absolute numerical equality, nor would this be possible, but, rather, "as nearly of equal population as is practicable." How much variance is permissible? In house plan No. 5 the largest district populationwise numbers 73,866, the smallest 68,246. In senate plan No. 5 the largest is 216,118, the smallest 199,528. This compares with Austin-Kleiner as follows: senate, largest 207,094, smallest 205,064; house, largest 72,200, smallest 69,118. These population differences, in either plan, between the largest and smallest districts, with the rest running about halfway between, are hardly the kind of stuff from which political power and influence and deprivation of equal protection of the laws are made. Obviously, no exact formula of permissive variance can be expected. The object in *Reynolds* and the others seems to have been to prevent control by minorities. Such slight differences as here discussed are not of significance in that regard. The *Reynolds* provision for equality of population as nearly "as is practicable" seems to call for use of common sense. If the majority of the Michigan electors voting on adoption of a Constitution in 1963 decided that they desired the meager checks and balances inherent in some consideration of area and geographic factors in apportionment of legislative powers, I do not believe that *Reynolds* requires total

---

* The amendment and changes in senate plan No 5 relating to senate district No 36 were proposed by petitioners herein, as suggested by intervenors, and thereafter adopted by the Republican commissioners.

disregard of those wishes of the electors as expressed in the State Constitution itself merely for the sake of avoiding such slight population differences between districts as contained in plans No. 5. Common sense and the object sought by the United States Supreme Court to be attained, do not so require.

In my view, house and senate plans No. 5, as amended, most accurately comply with the permissible, surviving standards and requirements of article 4, § 6, Michigan Constitution of 1963, and with that permissible object in mind, their districts are as nearly as practicable of equal population for the purposes sought to be subserved in *Reynolds*.

An order should enter declaring the Austin-Kleiner plan unconstitutional and remanding it to the commission for further action consistent herewith.

KELLY, J. (*for remand to the commission*). I am in complete agreement and accord with Justice DETHMERS' opinion. I write to add to the thought he properly described as a "constant denial of their petition for discovery," and oppose and disagree with the following three conclusions of Justice ADAMS that (1) "petitioners' allegations are insufficient to state a legal claim of gerrymandering"; (2) "petitioners have failed to demonstrate that discovery would be appropriate to this case"; and (3) "the motivations, cogitations, and machinations of the commissioners, even if discoverable, would not be relevant," and Justice SOURIS' conclusion that he does "not regard petitioners' allegations legally sufficient to state a claim upon which judicial inquiry can be made."

Thirty-four distinguished Michigan citizens petitioned this Court on August 22, 1964, to rescind our June 22, 1964, approval of the Austin-Kleiner plan and allow them to prove to this Court that:

"Austin and Kleiner and others who actually participated in the drawing of the Austin-Kleiner plan obtained and utilized extensive data and records of past voting results in each precinct, city, township, and county, specifically including the results of the 1962 State treasurer election, which data and records were compiled and tabulated by and with the support of the Democratic party and the International Union, UAW. The purpose of utilizing such data and records by Austin, Kleiner and their aides, was creation of an apportionment plan most favorable to the Democratic party and its candidates.

"Different variations of a plan with districts of equal population were drawn from time to time in the course of preparing the Austin-Kleiner plan, each of which was tested by application of such data and past voting records, and such plan was successively revised and redrawn in attempts to maximize Democratic party voting strength, or to minimize Republican party voting strength.

"The draftsmen of the plan, after its adoption, openly boasted of their success in achieving their objectives and also stated openly that they intended the plan as 'a negotiating document' and had not expected to be able to get it adopted in its original form.

"The plan accomplishes such gerrymandering by apportioning the districts without any regard for political subdivision or natural or historical boundary lines, and by constructing unnaturally-shaped districts in order to join geographically separated concentrations of voters of one or the other party, or to split up certain of such concentrations."

Petitioners set forth in detail what they claimed to be "The intentional acts of malapportionment and gerrymandering for political advantage."

The attorney general, for defendant secretary of State, and the attorneys for intervening defendants, have vigorously opposed taking of proof that would

establish the truth or falsity of petitioners' gerry-mandering charge.

Petitioners' request to present this proof by discovery proceedings was denied by this Court on January 14, 1965, with Justices Dethmers and Kelly dissenting to the denial.

Petitioners stressed the importance of this proof in a motion for reconsideration, and the order of January 14, 1965, was amended on February 5, 1965, to read:

"Whether, and if so to what extent, petitioners' offer of proof should be granted and proof taken, may be briefed and will be decided after oral argument has been completed and considered."

Petitioners emphasize the importance of this Court recognizing their claim of improper motives and actions by those who created the Austin-Kleiner plan, by commencing their brief under the heading "statement of facts," as follows:

"By way of introduction to this statement of facts, the unique nature of this proceeding must be emphasized. Despite the fact that the proceedings raise disputed questions of fact, this Court has not allowed the presentation of proofs offered by petitioners in support of their fact allegations. There is no record except the pleadings. Therefore, this proceeding resembles one in which a motion for summary judgment in favor of the defendants had been granted, and now the most favorable view must be taken of petitioners' allegations of fact and offer of proof. Thus, where relevant, those allegations of fact and the offer of proof in support thereof will, for purposes of this brief, be regarded as if actually proved."

Under this Court's rotation assignment of cases, I was assigned to write the first opinion, which I filed with my Associate Justices on September 22, 1965,

reported in 376 Mich 420, and concurred in by Justice
Dethmers.

In this opinion I made known why I could find no
merit to defendants' reasons why we should deny
petitioners' request and referred to defendants'
efforts to avoid the issue as follows (p 437):

"In spite of petitioners' contentions, defendants
have only presented this Court with a general denial.
We have searched the brief of defendant and the
briefs of intervening defendants in vain for any
specific denial of petitioners' claim, such as the
planners' use of voting results as they changed and
rechanged the boundary lines of districts in their
endeavor to create districts most favorable to the
Democratic party and its candidates."

I granted petitioners' request, stating (p 439):

"An order will be issued providing that the deposi-
tions will be taken under the direction and super-
vision of the presiding circuit judge of the county
of Ingham; that said depositions will be taken as
soon as possible and continued on to completion with-
out delay; that 24 copies of the report of such hearing
on depositions will be filed with the clerk of the
Supreme Court and placed before the members of
this Court, so that this Court can reach final deter-
mination in sufficient time to not unduly impede the
coming 1966 elections."

Unable to obtain sufficient support for my recom-
mendation of discovery, I, on October 27, 1965, filed
an addendum to my opinion in which I said (pp 439,
440):

"I disagree that we have not the right and duty
to dispose of the discovery question but after study-
ing the opinions served and realizing that of the five
Justices, other than myself, who have as of this date
written opinions, three have expressed the thought
that the commissioners should try anew to reappor-

tion for the 1966 election, I have concluded to join
with them with the understanding expressed that the
commission shall immediately convene and shall con-
clude its work within 90 days and that we retain
jurisdiction of all matters now before us, including
the matter of discovery."

After the four commissioners refused to change or
alter the 1964 Austin-Kleiner plan and the matter
was returned to this Court, this Court on January 12,
1966, with Justices DETHMERS and KELLY dissenting,
denied petitioners' discovery request.

This Court has not taken a favorable view of
petitioners' allegations of fact and offer of proof,
nor have we allowed proof in spite of this Court's
liberal policy of allowing discovery.

We have acted contra to our principles of the past
as enunciated by our illustrious predecessor, Justice
WIEST, who, speaking for a unanimous Court, stated:

"We must assume that the right [discovery and
taking of proof and depositions] accorded by the
rule is invoked [by 34 Michigan citizens] in good
faith, and we cannot anticipate an abuse nor hold
that possibility of abuse warrants inhibition of the
right."*

Defendants rely on the United States Supreme
Court decision of *Reynolds* v. *Sims,* 377 US 533 (84
S Ct 1362, 12 L ed 2d 506), as giving them the right
to disregard the Michigan Constitution, but nothing
in that United States' decision would justify the
gerrymandering petitioners state they can prove if
allowed by this Court.

Justice SOURIS states in his last opinion that (1)
"Petitioners' allegations of partisan gerrymander-
ing in the alternate Austin-Kleiner plan are unten-
able under either Federal or State law"; (2) "The
United States Supreme Court has refrained from

---

* *Nestle* v. *Fleming* (1933), 262 Mich 417.

holding that such gerrymandering presents a reviewable Federal constitutional question"; and (3) "I am not persuaded by petitioners' argument that such claims present such Federal questions, nor do I regard the conclusory allegations petitioners have made legally adequate to warrant our breaking such new Federal ground." Answering Justice SOURIS, I refer to my previous opinion (376 Mich at pages 427, 428):

"*Answer to* [*defendants'*] *objection* (2): Petitioners answer the claim of defendants that if we would grant petitioners' request we would be outrunning the United States Supreme Court by calling attention to the fact that until *Baker* v. *Carr* (1962), 369 US 186 (82 S Ct 671, 7 L ed 2d 629), claims regarding apportionment of State legislatures were not justiciable at all; that from a fair reading of recent cases[7] one can only conclude that a plan which intentionally operates to nullify the fair and effective representation of members of one particular political party is as much a denial of equal protection of the laws as districts of grossly disparate population; that on March 15, 1965, the New York supreme court, New York county, in *In re Orans' Petition,* 45 NY Misc 2d 616 (257 NYS2d 839), affirmed by 15 NY2d 339 (258 NYS2d 825, 206 NE2d 854), held that gerrymandering constitutes a violation of the State's constitutional provisions, which were very similar to Michigan's; and that 'The argument of defendant and intervening defendants that there is no law against gerrymandering suggests that although gerrymandering may be immoral, or unfair, or a sharp practice, nevertheless since there is no case law which says it is illegal, it should be condoned by this Court. The people of the State of Michigan are entitled to a higher standard of law.'

"It is not necessary for us to analyze or pass judgment on the presence or absence of Federal decisions *in re* gerrymandering. Suffice to say,

there is no Federal decision that even intimates that this Court cannot or should not grant the petition if we deem it advisable."

"7 *Reynolds* v. *Sims* (1964), 377 US 533 (84 S Ct 1362, 12 L ed 2d 506) ; *Fortson* v. *Dorsey* (1965), 379 US 433 (85 S Ct 377, 13 L ed 2d 290) ; *Wright* v. *Rockefeller* (1964), 376 US 52 (84 S Ct 603, 11 L ed 2d 512)."

I am in complete disagreement with those who claim that even though petitioners could sustain their claim by proof this Court would consider such proof as irrelevant and incompetent. I cannot conceive of any court creating by its approval an apportionment plan with such "unnaturally-shaped districts" so politically created.

As I conclude my part in the most important decision this Court has been called upon to make during my 12 years as a Supreme Court Justice, I regretfully conclude that this Court has denied petitioners the right to introduce proof that would be all-important in rendering a proper decision.

O'HARA, J. (*for remand to the commission*). With "recorded reluctance" I cast my vote to order the commission on legislative apportionment to adopt and publish the Austin-Kleiner alternate plan "for the 1964 legislative election." *In re Apportionment of State Legislature–1964,* 373 Mich 250, 255.

I have not had at any time an opportunity to pass upon the validity of that plan by permissible State constitutional standards. I do so now. I concur with Mr. Justice DETHMERS in his opinion.

SOURIS, J. (*for dismissal of petition*). On three prior occasions I have expressed my view that not only the 80–20 formula for apportioning the senate and the .7% formula for apportioning the house, both of which appear in article 4 of our Constitution of 1963, violate the equality clause of the Fourteenth Amendment of the United States Constitution, as a

majority of this Court held in June of 1964, but also that, except as set forth in the margin,[1] none of the first six sections of said article 4 legally survived that ruling of constitutional invalidity. See *In re Apportionment of State Legislature—1964*, 372 Mich 418, 461–469; *In re Apportionment of State Legislature—1964*, 373 Mich 247, 257–262; and *In re Apportionment of State Legislature—1965*, 376 Mich 410, 458–469. It has been, and remains, my view that the invalidity of the cited provisions of article 4 imposed upon this Court responsibility for provisional reapportionment of the State's legislative power pending enactment of legislative or constitutional provisions for periodic reapportionment in accordance with the requirements of the Federal equality clause as construed by the Supreme Court in *Reynolds* v. *Sims* (1964), 377 US 533 (84 S Ct 1362, 12 L ed 2d 506).[2]

It was my view in June of 1964 that this Court then should have adopted the alternate Austin-Kleiner plan as its own provisional legislative reapportionment plan to be effective for the 1964 elections, "leaving for the legislature so reapportioned

---

[1] "Sec. 1. The legislative power of the State of Michigan is vested in a senate and a house of representatives.

"Sec. 2. The senate shall consist of 38 members to be elected from single member districts at the same election as the governor for four-year terms concurrent with the term of office of the governor. * * *

"Sec. 3. The house of representatives shall consist of 110 members elected for two-year terms from single member districts apportioned on a basis of population."

[2] In addition to *Reynolds* v. *Sims*, see the following cases, decided on the same date, in which the Supreme Court approved judicially decreed provisional reapportionment plans pending revision of statutory or constitutional reapportionment provisions declared invalid: *WMCA, Inc.*, v. *Lomenzo, Secretary of State* (1964), 377 US 633 (84 S Ct 1418, 12 L ed 2d 568); *Lucas* v. *Forty-Fourth General Assembly of the State of Colorado* (1964), 377 US 713 (84 S Ct 1459, 12 L ed 2d 632); *Maryland Committee for Fair Representation* v. *Tawes, Governor* (1964), 377 US 656 (84 S Ct 1429, 12 L ed 2d 595); *Davis* v. *Mann* (1964), 377 US 678 (84 S Ct 1441, 12 L ed 2d 609); and *Roman* v. *Sincock* (1964), 377 US 695 (84 S Ct 1449, 12 L ed 2d 620).

and elected or to the people themselves by constitutional initiative or referendum processes the task of fashioning for the future a periodic reapportionment plan in conformance with the requirements of the Fourteenth Amendment as construed by the United States Supreme Court." 373 Mich 247, 260, 261. None of my colleagues agreed. Instead, having concluded, albeit *sub silentio,* that all of section 6 of article 4 survived our declaration of constitutional invalidity of the reapportionment formulae of article 4, a majority of this Court (the Chief Justice, and Justices BLACK, SMITH, O'HARA, and ADAMS), acting pursuant to the provisions of paragraph 7 of that section 6, directed the commission on legislative apportionment to adopt and publish the alternate Austin-Kleiner plan as the State's reapportionment plan but subject, after the 1964 elections to be held pursuant thereto, to the right of any elector to challenge that plan as provided by "the final paragraph of said section 6 of article 4." 373 Mich 247, 254. The commission performed its duty as directed by this Court's order to do and the secretary of State performed his by publishing and distributing the plan as provided by section 6. In due course the 1964 legislative elections were held within the districts specified in the alternate Austin-Kleiner plan and, in the meantime, pursuant to the final paragraph of section 6, this proceeding was commenced to challenge the use of that plan of reapportionment in subsequent elections.

On November 2, 1965, this Court, by majority vote in this proceeding ordered the commission again to reapportion the legislative power of the State within 60 days thereafter. The secretary of State, by report and petition to this Court filed on January 4, 1966, has advised the Court that the commission again is unable to agree on a plan for such reapportionment and prays entry by this Court of a further

order. While I did not join in the Court's November order, because in my judgment the plan adopted in June of 1964 was our judicially decreed provisional reapportionment plan and because time yet remained for legislative initiation of a constitutional amendment providing for a valid permanent periodic reapportionment plan, nor did the Chief Justice and Mr. Justice SMITH, because in their judgment the petition failed to persuade them that petitioners were entitled to any relief provided in the eighth paragraph of section 6 of article 4, they and I, together with our colleagues, nonetheless share the responsibility for determining what course these proceedings now take.

It has been suggested that the Court's November order was predicated upon a finding that the alternate Austin-Kleiner plan adopted by the commission pursuant to this Court's June, 1964 order is not a "final" one subject to the review provided for by paragraph 8 of section 6 of article 4 and that no "final plan" has as yet been adopted for want of a concurrence of a majority of the members of the commission. Therefore, it is argued, what the Court's majority did in November was, in the language of paragraph 8, to "direct * * * the commission to perform [its] duties", specified in paragraph 5 to be "to district and apportion the senate and house of representatives according to the provisions of this Constitution." See Mr. Justice BLACK's opinion at 376 Mich 410, 446, and his current memorandum.

The commission having failed again to perform such duties thus hypertechnically construed, I would have supposed that the Court's only constitutional recourse within the limited powers granted it by section 6 of article 4 would be, under paragraph 7 thereof, to receive from the commissioners whatever proposed plans they care now to submit and to "determine which plan complies most accurately

with the constitutional requirements" and direct that it be adopted by the commission. Thereafter, I would have supposed further, upon application of any elector, pursuant to paragraph 8, that the Court, consistent with the theory being considered, would be obliged again to direct the commission to perform its duties, thus beginning again the circuitous passage from paragraph 5 to paragraph 7 to paragraph 8 to paragraph 5 of section 6. But instead of pursuing this theory to its logical, though irrational, end, it is suggested that our constitutionally mandated duties, even as thus interpreted, be aborted by entry of our *sua sponte* order for a public drawing of lots to reduce the evenly divided bipartisan commission of eight members to an extraconstitutional commission of seven. See 376 Mich 410, 446, and Justice BLACK's current opinion. What once was regarded as "the constitutionally *exclusive* duty of the commission on legislative apportionment" (see 376 Mich 410, 444), a commission consisting of eight members selected as prescribed by what my colleagues regard as a continuingly valid constitutional provision of article 4, would become the *final* duty of a judicially sired commission of *seven* lacking any constitutional sanction whatever.

In addition, this interpretive theory reads into the Constitution provisions that are not there. For example, accepting for purposes of argument Justice BLACK's assertion (376 Mich 410, 446) of significance in the fact that paragraph 7 does not refer to a "final" plan in authorizing the Court to direct the commission to adopt one of the proposed plans submitted to the Court by the commissioners after a commission deadlock, must not paragraph 6[3] of sec-

---

3 "Each final apportionment and districting plan shall be published as provided by law within 30 days from the date of its adoption and shall become law 60 days after publication. The secretary of State shall keep a public record of all the proceedings of the commission and

tion 6 be read to mean that only a "final" plan (as defined by Justice Black) ever shall become law? I submit that if there be any virtue in judicial consistency it must be so read unless, of course, we are free to supplement the constitutional language to provide that, as well, any "nonfinal" plan adopted by the commission upon order of the Court also shall become law 60 days after publication, but only until the Supreme Court takes further action pursuant to paragraph 8. The absence of any language in section 6 so providing suggests to me that it was not intended to draw the distinction Justice Black draws between a plan adopted by a majority of the commission pursuant to its duties prescribed in paragraph 5 and a plan selected by the Supreme Court from among those proposed by the commissioners and ordered by the Supreme Court to be adopted by the commission pursuant to the provisions of paragraph 7.

Such an interpretation of section 6 of article 4 needlessly complicates simple language written into our Constitution, requires that even that interpretation of the section be scrapped in our present circumstance of continuing failure of voluntary concurrence of a majority of the commissioners upon a plan, and overlooks a rational interpretation of the section which the minutes of the Constitutional Convention disclose was the intention of the draftsmen themselves.

As I read section 6, and as did the Constitutional Convention delegates who drafted and proposed it, as will be demonstrated, *infra*, there is no such distinction between a plan adopted in the first instance by a majority of the commission and a plan adopted by the commission upon order of this Court following a commission deadlock. In each case, the plan

shall be responsible for the publication and distribution of each plan."
Const 1963, art 4, § 6, paragraph 6.

adopted becomes a "final" plan; it becomes law 60 days after publication; it becomes subject to an elector's challenge by proceedings brought under paragraph 8 of section 6 for judicial review thereof; and, upon finding that it fails to comply with the requirements of the Constitution, it may be remanded to the commission for further action. In addition, paragraph 8 provides that in such a proceeding the Supreme Court "shall direct the secretary of State or the commission to perform their duties", a provision inserted in paragraph 8, in my judgment, to provide a constitutionally specified judicial procedure in the nature of a writ of mandamus for enforcing performance of duties the secretary of State or the commission conceivably otherwise might refuse adamantly to perform. For example, a secretary of State might fail or refuse to publish and distribute a plan adopted by the commission pursuant to either paragraph 5 or paragraph 7, in which event the Supreme Court would direct him to do so. Similarly, if the commission or any of its members failed or refused to respond to the secretary of State's call to convene, the Supreme Court would direct it or them to do so. It stretches the judicial power of mandamus beyond its outer boundaries to suggest, as it has been suggested in Justice BLACK's latest opinion, that this Court can order the commission *to agree* upon threat of "an order of contempt bearing an accumulatory daily fine of each commissioner until the commission arrives at a 'final decision' under paragraph 5 (of said section 6)."[4]

---

[4] Justice BLACK urges the Court to find the commissioners in contempt of the Court's November 2, 1965, order, in spite of the fact that such order specifically provided:

"2. In event of another deadlock of the commission, continuing through expiration of such 60-day period, that the secretary of the commission report promptly to this Court with petition for entry of such further mandatory order as the Court may, at the time, choose

This is the clear import of the constitutional language and, in addition, the debates of the constitutional convention delegates disclose beyond dispute that this is what they read the language to mean. Indeed, the very point was considered and the convention was assured that any plan which the Court ordered adopted would be a plan adopted by the commission and, as such, be reviewable by the Court. Consider this discussion on March 30, 1962, of a proposed amendment to section 6 of article 4:

"*Mr. W. F. Hanna:*   *   *   *

"Now, the committee proposal is careful to say the Supreme Court shall determine the plan which shall be adopted. Perhaps this is a play on words. But we want the adoption to be made by the commission, not by decree of the Court, so that you end up with a mandamusable body or a suable body, and reviewable by the Court. I believe the language in committee was carefully considered to accomplish this point. So I urge the defeat of the Nord amendment, on the basis that the first line is not necessary, and the second line will be cured by the committee amendment, which preserves what we were very determined to do; that this Court would not decree the apportionment plan, but the Court would direct the plan that the commission would adopt, leaving the Court in a position to review the plan not of their own decree, but to review an action taken by

---

to enter pursuant to its broad powers as on mandamus to a State officer." (See 376 Mich 482—REPORTER.)

Concerning mandamus, Justice BLACK quoted approvingly, in *Superx Drugs Corporation* v. *State Board of Pharmacy* (1963), 372 Mich 22, 34, this language from *Toan* v. *McGinn* (1935), 271 Mich 28, 34:

" 'The applicable rules are clear. To support mandamus, plaintiffs must have a clear legal right to performance of the specific duty sought to be compelled; defendants must have the clear legal duty to perform such act; and it must be a ministerial act, one "where the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." 38 CJ, Mandamus, § 72, p 598. See, also, *Globe Indemnity Co.* v. *Richer*, 264 Mich 224; *Sezor* v. *Proctor & Gamble Soap Co.*, 267 Mich 128.' "

a commission after the direction of the Supreme Court." 2 Constitutional Convention 1961, Official Record, p 2025.

The convention rejected Delegate Nord's amendment.

The issue arose again during the debates of April 25, 1962:

"*Mr. Norris:* Mr. President, Judge Dehnke, my question was: In view of the fact that one of the reasons for an apportionment commission is to make available a review which had not been present thus far in a mandamusable fashion, is it the specific intent of this apportionment provision under the language contained in the proposal to provide for a review by the Court upon petition of the qualified electorate of the plan of apportionment adopted by the apportionment commission?

"*Mr. Dehnke:* I think the language speaks for itself, Dr. Norris. The Court may review, upon such a petition, a final plan adopted by the commission and make orders amending the plan if it fails to comply with the requirements of the Constitution. I think we may safely assume that the Court, if it makes any amendments, will make them in conformity to the requirements of the Constitution—the specifications, in other words.[5]

"*Mr. Norris:* My second question, Mr. President, Judge Dehnke, is with regard to the situation that prevails when there is disagreement among the members of the apportionment commission. Do I understand then the language here, in view of that contingency, is suggestive of this: that the various

[5] As of April 25, 1962, the draft of section 6 being considered by the convention was substantially the same as that finally adopted, except that instead of providing that the Court "shall remand such plan to the commission for further action if it fails to comply with the requirements of this Constitution," it read "shall make orders amending such plan if it fails to comply with the requirements of this Constitution". 2 Constitutional Convention 1961, Official Record, p 2800. The former language was finally adopted, see 2 Constitutional Convention 1961, Official Record, pp 3103, 3104, 3238, 3275.

members of the apportionment commission then submit their respective plans to the Court for appraisal of the plan most nearly in accordance with the constitutional standards and the Court then issues an order?

"*Mr. Dehnke:* The Court then what?

"*Mr. Norris:* Issues an order.

"*Mr. Dehnke:* The Court determines which of the plans complies most accurately with the requirements of the Constitution and returns it to the commission for the order to be made by the commission, according to the language of the proposal.

"*Mr. Norris:* It comes back then to the commission?

"*Mr. Dehnke:* Yes. The commission is subject to mandamus action by the Court if it fails to comply with the order of the Court. * * *

"*Mr. W. F. Hanna:* Mr. President and Dr. Norris, I'd like to further amplify Judge Dehnke's answer to you. We made it in this manner so that deliberately, after the Court gave its opinion and directed the commission, the order became appealable back to the Court if an elector felt that it was not proper. If we leave it to the Court to order, then, in effect, there is no appeal but to the Federal courts. We wanted the commission to enter the order so that it did become appealable back to the Court by this elector." 2 Constitutional Convention 1961, Official Record, pp 2802, 2803.

It should be noted that the passage just quoted, in addition to affirming that a plan which the Court orders the commission to adopt is a "final" plan reviewable by the Court under paragraph 8 of section 6, also explains the meaning of that language in paragraph 8 which provides that upon proper application of an elector the Court "shall direct the secretary of State or the commission to perform their duties". As Judge Dehnke makes clear, the delegates conceived of a situation in which the com-

mission might refuse to obey an order of the Court directing it to adopt a certain apportionment plan. In that event, upon application of an elector, the Court would issue an order in the nature of a writ of mandamus directing the commission to perform its duty, namely, to adopt the plan ordered by the Court.

The conclusion, that an apportionment plan which the Court orders the commission to adopt is a final plan reviewable under paragraph 8 of section 6, is logically imperative in the context of section 6. The convention record amply demonstrates that such a conclusion implements the express intent of the delegates. Finally, the only other suggested reading of section 6's language involves one in the unnecessary and illogical practical difficulties which I have discussed above. In such circumstances our duty is clear: to follow the Constitution, as it is written, as the delegates expressly intended it to be followed, and as every dictate of common sense and logic demands. This means that the alternate Austin-Kleiner plan, which the commission adopted in June of 1964 under order of this Court, is a final plan reviewable by this Court pursuant to paragraph 8 of section 6 of article 4 of the Constitution.[6]

---

[6] In the Preface to the Address to the People, it is stated, with reference to legislative apportionment:

"The significant decisions on this highly controversial subject are—

"1. Establishment of a commission equally representing the major political parties to reapportion periodically house and senate seats in accordance with requirements of the Constitution. Supreme Court review is provided in the event of disagreement of the commission." 2 Constitutional Convention 1961, Official Record, p 3359.

In the address itself, section 6 is discussed, as is pertinent here, thusly:

"Upon the application of any elector the Supreme Court may compel the performance of duties imposed in this section and may review any plan adopted by the apportionment commission and remand it to the commission for further action if it fails to comply with the requirements of the Constitution." 2 Constitutional Convention 1961, Official Record, pp 3371, 3372.

Nothing startling is revealed by these explanations because the

While I continue to believe that this proceeding should be regarded as one invoking our general equitable power to provide by judicial decree another provisional legislative reapportionment plan for the year 1966 or until adoption of valid statutory or constitutional enactments providing for periodic legislative reapportionment (376 Mich 410, 469), unfortunately none of my colleagues shares my view. Nor do I share the view that no "final" plan yet has been adopted and, therefore, that this Court cannot review, within the purview of paragraph 8, any plan until such a "final" plan, as defined by Justice BLACK, is, if ever, adopted by the commission. The only practical alternative I perceive is that which I have adopted in this opinion in the interest of inviting decretal accord—considering section 6 of article 4 as of continuing constitutional validity and construing its provisions as I have. Thus, I have put aside, at least for awhile, views which I have expressed repeatedly, but without persuasive success. There remains, for me, only the review of the alternate Austin-Kleiner plan[7] required of this Court now by paragraph 8 of section 6, thus construed.

Justice SMITH, with whom the Chief Justice concurred last November, considered these proceedings then to require such review and proceeded to do so.

---

constitutional language itself is clear, and the explanations comport with the meaning of the language as it has been developed, *supra*.

[7] In paragraph 3 of petitioners' "Amended Petition for Review of Apportionment Plan", the jurisdiction of this Court is invoked by direct quotation of paragraph 8 of section 6, with one clause significantly deleted therefrom:

"Upon the application of any elector filed not later than 60 days after final publication of the plan, the Supreme Court, in the exercise of original jurisdiction, * * * may review any final plan adopted by the commission, and shall remand such plan to the commission for further action if it fails to comply with the requirements of this Constitution."

The clause significantly deleted by the petitioners themselves, of course is "shall direct the secretary of State or the commission to perform their duties."

376 Mich 410, 470. I join now in the views the Chief Justice and Justice SMITH then expressed. Specifically, I agree with the following italicized findings then made by them:

1. *Petitioners' allegations of partisan gerrymandering in the alternate Austin-Kleiner plan are untenable under either Federal or State law.* As Justice SMITH observed, although presented with opportunities to do so, the United States Supreme Court has refrained from holding that such gerrymandering presents a reviewable Federal constitutional question. Indeed, in the latest case in which such a claim was presented to the Supreme Court, squarely, the Supreme Court affirmed, but without opinion, the district court's judgment in which such claim was rejected. See *WMCA, Inc.,* v. *Lomenzo* (1965), 382 US 4 (86 S Ct 24, 25, 15 L ed 2d 2).[8] While I do not suggest that this Court would be barred from considering such claims until the United States Supreme Court affirmatively declares them to present justiciable Federal questions, I am not persuaded by petitioners' argument that such claims present such Federal questions, nor do I regard the conclusory allegations petitioners have made legally adequate to warrant our breaking such new Federal ground.

No such doubt exists concerning the right of the State to prescribe, by constitutional or constitutionally permitted legislative enactment, standards of apportionment designed to prohibit such gerrymandering. See *Reynolds* v. *Sims, supra,* 377 US 533, 578. But the difficulty with petitioners' State law claim is threefold: (1) Some of us have found (376 Mich 410, 458, 470) that none of such standards contained in article 4 of the Constitution of 1963 was severable from the invalid house and senate

---

[8] Affirming *WMCA, Inc.,* v. *Lomenzo* (SD NY), 238 F Supp 916.— REPORTER.

apportionment formulae and, hence, that they, likewise, were invalid. Absent valid State constitutional or legislative standards designed to preclude distortion of a rational apportionment scheme by partisan gerrymandering, as Justice Smith wrote in November, it is not the province of this Court to write into article 4 such standards. (2) Whether or not required by valid constitutional provision, the Chief Justice and Justices Black, Smith, and Adams held, a year ago last June (373 Mich 250, 251), and I agree now, that the alternate Austin-Kleiner plan, then ordered by the Court to be adopted by the commission, formed districts "as compact, contiguous, and regular in shape" and followed "county, city, and township boundaries as nearly as practicable." See 373 Mich 250, 254. Those are the very State standards[9] petitioners alleged in this proceeding were violated for partisan purposes by the alternate Austin-Kleiner plan. (3) Even if we assume that well pleaded allegations of partisan gerrymandering would raise a justiciable issue under our own State Constitution's equality clauses (article 1, § 1 and § 2), I do not regard petitioners' allegations legally sufficient to state a claim upon which judicial inquiry can be made. As I view the petitioners' complaint and their "offer of proof", they consist solely of conclusory allegations of suspicion and speculation supported only by reference to election results which, according to them, were achieved by the partisan gerrymandering by the alternate Austin-Kleiner plan. While petitioners assert they could support their claims if permitted

[9] I find no continuingly valid requirement in article 4 that county boundary lines be not breached. The only provision that districts adhere to county lines is found in the last paragraph of section 3 which deals with the allocation of representatives in the house within multiple county representative areas by application of the apportionment formula which all members of the Court agree is constitutionally invalid.

to engage in a process of discovery, they have failed to submit an offer of proof of facts within their power to establish as distinguished from facts which they hope to discover.

2. *Our orders of June, 1964 (373 Mich 247, 248, 249), violated no concepts of due process.* While the practical facts of the then existing election process timetable required prompt action by this Court and by the commission following the long awaited decisions of the United States Supreme Court in *Reynolds* v. *Sims,* and its accompanying cases, I agree with Justice SMITH that it is something less than candor to plant a due process argument on the assertion that only five days elapsed between *Reynolds* v. *Sims* and the decision by this Court ordering commission approval of the alternate Austin-Kleiner plan. Justice SMITH in November accurately stated the facts that the commission had before it for many months before *Reynolds* v. *Sims* reapportionment plans based upon districts of equal population, that extended hearings lasting two full days before this Court explored population criteria for reapportionment purposes, and that a representation was made to this Court that the commission could furnish other population based plans in 24 hours if desired. 376 Mich 410, 479, 480.

One additional fact must be added. Now, 60 more days have been granted the commission to produce such additional plans, according to population criteria a majority of this Court said in November were now ascertainable, and yet no agreement thereon was reached by a majority of the commission. While other plans assertedly favoring population criteria were drawn and one of such plans has been offered for consideration by this Court, about which I shall have more to say later in this opinion, the point is that now, after 60 more days of deliberation by the commission, the petitioners' due process

argument no longer has even a colorable basis for its assertion.

3. *The alternate Austin-Kleiner plan complies with the requirements of the Federal equality clause as those requirements have been construed by the United States Supreme Court in* Reynolds v. Sims *and, if we assume,* arguendo, *that the 1963 Constitution's standards of compactness, contiguity, and regularity of shape and of conformity to county,*[10] *city, and township boundaries survived the constitutional infirmity of the reapportionment formulae, the plan conformed with those State standards, as well.*

During the course of these proceedings before this Court, the parties hereto brought to the attention of the Court the fact that an error exists in house districts No. 87 and No. 88 of the alternate Austin-Kleiner plan as ordered by this Court to be adopted by the commission in June of 1964. The error, variously described as a mathematical error and as a mechanical error, can be corrected and, in my judgment, it should be, as indicated in the margin.[11]

---

[10] See footnote 9, p 446, *supra.*

[11] House district 87, consisting of all of Shiawassee county, and from Clinton county the townships of Watertown, DeWitt, Bath, Victor, Olive, and Duplain. Population: 71,564.

The description of house district 88 need not be changed except for its statement of the district's population, which should be increased to 71,851. With this correction made, the population disparities of the alternate Austin-Kleiner plan set forth in the Chief Justice's opinion in *In re Apportionment of State Legislature—1964,* 373 Mich 250, at 252, 253, are correct.

[The descriptions of house districts 87 and 88 as they appear in PA 1964, p 616, as revised, would then read as follows:

87. All of Shiawassee County; from Clinton County the townships of Bath, DeWitt, Duplain, Olive, Victor, and Watertown.

88. From Eaton County the township of Oneida and the city of Grand Ledge; from Clinton County the townships of Bengal, Bingham, Dallas, Eagle, Essex, Greenbush, Lebanon, Ovid, Riley, and Westphalia, and the city of St. Johns; all of Gratiot County; from Midland County the townships of Edenville, Geneva, Greendale, Jasper, Lee, Porter, and Warren and the city of Coleman.—Reporter.]

Six members of this Court, the Chief Justice and Justices BLACK, SMITH, O'HARA and ADAMS and I, in June of 1964 expressly held that the alternate Austin-Kleiner plan complied with the requirements of the Federal equality clause. See 373 Mich 250, 251, 255, and 257. The Chief Justice and Justices BLACK, SMITH, and ADAMS also found that the plan's districts were compact, contiguous, and regular in shape and followed county, city, and township boundaries as nearly as practicable, subject, of course, to the controlling Federal constitutional objective of substantial population equality. See 373 Mich 250, 251. I now join them in this finding, noting as I do that this finding is a relative one which requires a judgment on how far one can or should go in subordinating the population equality requirements of the Federal Constitution to other considerations in reapportioning the legislative power of a State. It is my judgment, as it was the Chief Justice's and Justices BLACK's, SMITH's, and ADAMS', that the alternate Austin-Kleiner plan did not so debase population equality in favor of district shape and form and adherence to boundary lines that it violated constitutional limits.

Nor does anyone suggest it does. What is said, instead, is that other plans now devised reduce even the alternate Austin-Kleiner plan's minor disparities almost to the vanishing point by minimizing concern for district shape and form and adherence to boundary lines (for example, senate and house plan No. 7, the so-called Civic Searchlight plan which the commission considered and rejected by a vote of 7 to 1) and, *per contra,* by enhancing concern for shape, form, and boundaries, the alternate Austin-Kleiner plan's minor population *disparities* need be *multiplied* less than *twice* for the house and *multi-*

*plied* only *eightfold* in the senate (proposed senate and house plan No. 5)!

What the proponents of these two new plans overlook is that the alternate Austin-Kleiner plan already has been adjudicated to comply with Federal constitutional standards and, if any State standards survive, to be in substantial compliance with them as well. To justify this Court's abandonment of a reapportionment and districting plan adopted upon this Court's order and pursuant to which the State's present legislature has been elected, would require persuasion that our prior adjudication of constitutionality was erroneous. I have not been persuaded that it was.

The thrust of the challenge against the alternate Austin-Kleiner plan is that it accomplishes greater equality than the Federal Constitution's equality clause requires at the expense of surviving State standards. It is not possible to claim, and nobody does, that the requirements of equality of population and all of the State standards claimed to survive can be met. If equality is approached, some boundary lines must be breached and some districts must be irregularly shaped. The alternate Austin-Kleiner plan approaches absolute population equality, perhaps more so than any other reapportionment plan in the United States, to date. Necessarily, some boundary lines were breached, 18 out of the State's 83 counties' lines in the senate and 32 in the house. However, preeminence of the Federal equality clause requirements, in our scheme of legal values, precludes any finding by this Court of constitutional infirmity in the alternate Austin-Kleiner plan on the ground that it renders equality too equally at the expense of subordinate State standards.

The only other plan offered this Court for its consideration is the so-called senate and house plan

No. 5.[12]  Even in that plan, 3 county boundary lines
are breached by the senate districts proposed and 11
by the house districts proposed.  The cost, in terms
of equality of population, of reducing the number of
county boundary lines breached is, as suggested
above, somewhat less than minimal.  Population
disparities in the house are almost doubled over
those under the alternate Austin-Kleiner plan while
in the Senate those disparities are magnified eight-
fold.

It may be of some help to compare what this
proceeding does not involve with what it does in-
volve.  It does not involve our determining whether
proposed senate and house plan No. 5 would pass
constitutional muster if it alone were offered to
replace an apportionment and districting plan de-
clared to be constitutionally invalid.  Neither does
it involve our making a choice between the proposed
senate and house plan No. 5 and the alternate
Austin-Kleiner plan for replacement of an existing
apportionment and districting plan declared to be
constitutionally invalid.  Nor does it involve making
a choice between a valid plan which achieves re-
markable population equality and a proposed plan
which to a much greater extent subordinates the
overriding Federal constitutional requirements of
equality in favor of alleged State requirements.
Instead, as I have stated above, this proceeding in-
volves only our review of the alternate Austin-
Kleiner plan in the face of allegations that it fails
to comply with constitutional requirements and such
allegations I have found to be without merit.

All of the foregoing considered, I announce my
readiness to join my colleagues in affirming again,
this time upon review under paragraph 8 of section

[12] Senate and House plan No. 7, the so-called Civic Searchlight plan,
was rejected by a 7 to 1 vote of the commission and has not been pro-
posed to this Court by any of the commissioners.

6, that the alternate Austin-Kleiner plan of legislative apportionment, as herein corrected, meets all Federal and State constitutional requirements and in decreeing that it shall be followed in the legislative elections scheduled to be held in the fall of 1966 and thereafter until the next decennial reapportionment provided for by said section 6 of article 4 or until such other time as may be provided by valid constitutional amendment.

Whatever the result we attain now, it should be crystal clear to all who will to see that constitutional amendment is imperative. No further demonstration is necessary of the fact that neither a commission on legislative apportionment, the members of which are designated by the major political parties of this State, nor this Court, in the exercise of the responsibilities unwisely imposed upon it by article 4, can function as the majority of the people voting upon adoption of the Constitution of 1963 erroneously believed possible. Constitutional change is imperative and time rapidly is becoming of the essence if repetition of our current difficulties is to be avoided hereafter.

The order of this Court should accomplish three things, in my view: First, the alternate Austin-Kleiner plan as heretofore adopted, should be corrected as indicated in footnote 11 above. Second, the alternate Austin-Kleiner plan, as so corrected, should be held to comply with all Federal and State constitutional requirements and, therefore, should be decreed to be followed in the 1966 elections and thereafter until the next decennial reapportionment or as otherwise may be required by constitutional amendment. Third, the petition herein should be dismissed, but without costs, a question of public importance being involved.

ADAMS, J. (*for dismissal of petition*).  I agree with Justice SOURIS that:   (1) the alternate Austin-Kleiner plan adopted in June of 1964 is a final plan reviewable under paragraph 8 of section 6 of article 4 of the 1963 Constitution; (2) petitioners' allegations are insufficient to state a legal claim of gerrymandering (see 5 below); (3) petitioners have been afforded due process; (4) the alternate Austin-Kleiner plan complies with requirements of the Federal equality clause; (5) petitioners have failed to plead facts from which it could be found that the alternate Austin-Kleiner plan is in such violation of the 1963 Michigan Constitution as to require that it be vacated.

With regard to (5) above, allegations that certain senate districts "are neither compact nor convenient", "are not as rectangular in shape as possible", that certain house districts "do not follow city or township boundaries where applicable", or "are not as nearly square in shape as possible" are conclusions, not statements of fact.  It is not too difficult to shape square, rectangular or compact, a single district.   The jigsaw arises from Michigan's two peninsulas with their some 3,000 miles of shoreline out of which must be created 110 house districts and 38 senate districts that conform (1) to overriding Federal standards, and (2) to legitimate State standards.

The recent 60-day remand to the apportionment commission demonstrates that it is possible to come up with numerous plans, all of which apparently have some merit.  Because of the nature of Federal constitutional standards, however, there is never full conformity with State standards.  As was noted in *In re Apportionment of State Legislature—1964,* 373 Mich 250, 253:

"All plans to some degree, and of manifest necessity, cross or recross county, city or township lines."*

Consequently, once a plan has been finally adopted, as the alternate Austin-Kleiner plan has been, for its validity to be successfully attacked there must be plead substantial departure from State standards. That has not been done here.

Petitioners have failed to demonstrate that discovery would be appropriate to this case. All of the proceedings of the apportionment commission are open, public records. The official figures of the United States census, election precincts, political and geographic boundaries, are matters of which this Court takes judicial notice. The motivations, cogitations and machinations of the commissioners, even if discoverable, would not be relevant. Only the plan is subject to review.

Smith, J. (*for dismissal of petition*). This is a continuation of apportionment proceedings begun in 1964, and occasioned by the adoption of the Michigan Constitution of 1963 (effective January 1, 1964). This new fundamental State law, containing new legislative apportionment formulae, was adopted before the decision in *Reynolds* v. *Sims* (1964), 377 US 533 (84 S Ct 1362, 12 L ed 2d 506). The decision in *Reynolds,* coming as it did after proceedings had been commenced under the Michigan Constitution, had a profound effect upon our processes. Inasmuch as *Reynolds* effectively struck from the Michigan Constitution significant apportionment provisions, this long, continuous proceeding reflects not only an

---

* The existing Austin-Kleiner Plan had a house population disparity between the largest and smallest districts of 3,082 and breached 32 out of 83 Michigan county lines. Its senate had a population disparity of 2,027 and breached 18 of the county lines.

Plan No. 5 resulted in a senate population disparity of 16,590, while breaching 3 county lines, and a house population disparity of 5,620, while breaching 11 county lines.

attempt on the part of the commission on legislative
apportionment and this Court to follow Michigan
constitutional provisions, but, also, to adjust such
provisions to the impact of the *Reynolds Case.* See
*In re Apportionment of State Legislature—1964,*
372 Mich 418, also, *In re Apportionment of State
Legislature—1964,* 373 Mich 247, and, also, *In re
Apportionment of State Legislature—1964,* 373 Mich
250. Likewise, see *In re Apportionment of State
Legislature—1965,* 376 Mich 410.

In my opinion of last November (1965), we at-
tempted to deal squarely with the issues presented
by petitioners in this phase of the proceedings. See
*In re Apportionment of State Legislature—1965,*
376 Mich 410, at 470. We might end the present
writing here by referring the reader to that opinion
in which the Chief Justice joined. However, this
is terminal to a historic proceeding and due to a
distressing inclination in some regions of this Court
to cut away the vitals of the 6–2 decision (373 Mich
250) establishing present apportionment, a move
which might have been unwittingly made to divert
the matter to another forum, we are moved to record
some additional facts and comments for all who may
follow.

Last November, by a vote of 5–3, with the writer
1 of 3 Justices in dissent, this Court remanded
the cause to the apportionment commission to "pro-
ceed anew with such work and deliberations as will
enable the commission to district and apportion the
senate and house of representatives according *to
now ascertainable as well as applicable requirements*
of the Federal Constitution and of the Michigan
Constitution." 376 Mich 410, at page 481. (Em-
phasis supplied.)

*Comment: What these "ascertainable as well as
applicable requirements" are the majority did not*

*say. Justice Black, however, tried to cure this deficiency by a solo opinion, as will be noted below.*

Those of us who dissented from the order did so not only because the order of the majority did not appear to be consonant with some of the views expressed by the majority Justices in their individual opinions preceding the order, but also "for the reason that the majority's order requires the commission to devise a plan of reapportionment of legislative power in accordance with standards not defined in any 1 of the 4 opinions signed by the aforesaid majority of five Justices of the Court." 376 Mich 482.

Although there is no record of any official communication between the apportionment commission and this Court between November 2d and November 20, 1965, Justice Black gleaned from sources which he did not reveal, that some members of the apportionment commission had expressed, in their early deliberations, a failure on the part of the Court majority "to provide expected 'guidelines' ". He, therefore, issued a solo opinion directed at the commission on November 20, 1965, which appears at 376 Mich 483. In it, he stated that "Justice Adams [had] reviewed these guidelines with due accuracy in his opinion filed November 2d." Justice Black then recorded "unconditional indorsement" of all of Justice Adams' opinion except the "first and final sentences thereof." This constituted an indorsement of Justice Adams' views relative to what we have come to term "antigerrymandering standards" which were said by Justice Adams to remain in the Michigan Constitution untouched by the decision in *Reynolds* v. *Sims, supra.*

As to such standards, Justice Adams had this to say (p 457): "At any rate, it seems clear that a State may forbid political gerrymandering, and I

interpret the provisions of the Michigan Constitution *with regard to compactness, shape, et cetera,* as being precisely for that purpose. Though the Federal standards are overriding and must be followed, I see no reason why the standards and provisions in our own State Constitution should not also be applied if it is possible to do so. I do not regard the failure of the 80–20 formula as having destroyed the standards." (Emphasis supplied.)

*Comment: The difficulty with this approach to guidelines is readily apparent. First, the apportionment scheme for house and senate contained in article 4 of the Michigan Constitution of 1963 is far more complex than the requirements of "compactness, shape, et cetera." Keystone of the senate formula as contained in section 2 of said article was the so-called 80–20 provision which gave 80% weight to population and 20% to land area. Everyone concedes that this was outlawed by* Reynolds v. Sims, *supra. We carry the analysis further. Based upon the 80–20 formula was a computation which resulted in the State as a whole having 500 apportionment "factors." For apportionment purposes, counties were then required to be classified based upon whether or not a particular county had less than 13 apportionment factors or more than 13 apportionment factors. See article 4, § 2, Michigan Constitution of 1963. Then, according to this constitutional formula, "the method of equal proportions [was to be] applied to the apportionment factors." After a provision for allocation of senate seats, based upon such determinations, then and only then did the requirements of "compactness, shape, et cetera", to use Justice* ADAMS' *phrase, come into play. The quoted section provided as follows: "Such counties shall thereafter be arranged into senatorial districts that are compact, convenient, and contiguous by land, as rectangular in shape as possible, and having as nearly as possible 13 apportionment factors, but*

*in no event less than 10 or more than 16." Article
4, § 2, supra.*

*The quotation above from the senate apportion-
ment formula itself is sufficient to demonstrate the
point which I tried to make in my opinion of last
November (376 Mich 470) that at the very heart of
the senate formula was the so-called 80–20 provision.
When the 80–20 provision was struck down by*
Reynolds *v.* Sims, *supra, then the whole formula fell
with it because of the unseverability of interdepend-
ent provisions. Extracting the 80–20 factor from
the senate apportionment formula was like pulling
the keystone from a building arch: the whole
structure crumbled.*

*The same may be said of the apportionment
formula for the house of representatives contained
in § 3 of article 4. There, the keystone of that for-
mula was the .7 per cent moiety clause. Although
that section commands that "The districts shall con-
sist of compact and convenient territory contiguous
by land", it is equally clear that this command is
necessarily dependent upon the .7 per cent moiety
clause. The language of the section expresses this
command: "Each county which has a population
of not less than seven-tenths of one percent of the
population of the State shall constitute a separate
representative area. Each county having less than
seven-tenths of one percent of the population of the
State shall be combined with another county or
counties to form a representative area of not less
than seven-tenths of one percent of the population
of the State." Const 1963, art 4, § 3. It is likewise
conceded by all parties that the .7 per cent moiety
clause was also felled by* Reynolds *v.* Sims. *It is
also clear that the manner in which this key provi-
sion of the house formula was employed in section 3
made it subject to the same ruling of severability
already expressed by me. (376 Mich 470.)*

We come, therefore, in this narrative to the point
last November when the Court majority decided to

remand the matter to the apportionment commission for further proceedings. It was clear then and even more clear now that this was destined to be an exercise in futility.

*Comment: The prime reason for the futile deadlock which occurred was evident in apportionment commission proceedings which took place in 1964. The prime cause lies with the constitutionally designated method of selection of apportionment commissioners. Such commissioners are selected by the major political parties in equal number and from specified geographical areas set forth in the Constitution. Responsibility to party is thus an unspoken but primary consideration. The second reason why the apportionment commission predictably stalemated was due to the failure on the part of the Court majority to state with a measure of precision in what way the unsevered portions (to follow the logic of their order) of the Michigan Constitution should be applied, while acknowledging that the 80–20 provision and the .7 per cent moiety clause no longer governed.*

*With all due respect to my colleagues in the majority, it is my earnest belief that they shared the erroneous view that a remand in this situation is something akin to the traditional remand of the Court to a lower court for the ascertainment of facts and the discovery and application of pertinent legal principles. This was asking too much. Again, with all due respect to the eight honorable gentlemen of the apportionment commission\* who labored so diligently both in 1964 and 1965 to develop a plan upon which a majority might agree, we suggest that*

---

\* Republican members: Cochairman Wilber M. Brucker (Detroit), lawyer and former Governor of Michigan; William F. Hanna (Muskegon), lawyer; Ralph Huhtala (Kingsford), public relations director; Alfred O. LaPorte (Standish), insurance and real estate broker.

Democratic members: Cochairman Richard H. Austin (Detroit), certified public accountant; Ivan Brown (Iron Mountain), labor representative; Henry J. Dongvillo (Scottville), farmer; A. Robert Kleiner (Grand Rapids), lawyer.

*the party responsibility that each gentleman bore by virtue of his appointment by his party made this a very difficult task and, in the final analysis, practically impossible. What is good for one party is often bad for the other. Commissioners chosen by political parties alone, without the purifying procedure of voter approval, are expected to be nonpolitical. No realist would ever expect so much.*

*What might have been provided in the Constitution is a tie-breaker. This could have been accomplished by a simple amendment which would give the secretary of State a vote only in case the commissioners deadlocked. The reason, and the only reason, for alluding to this office is because the secretary of State is, by the Constitution, secretary of the apportionment commission and is, of course, chief elections officer of the State. The secretary of State, therefore, could bring to such proceedings a certain amount of skill in election matters.*

We come now to a report and review of commission proceedings after remand by the Court majority. All of the official files of the apportionment commission including maps, plans, census data, and debates (electronically recorded) are properly before us. This was accomplished at our January 12, 1966, conference on motion and order of this Court. I have reviewed at length the records and files of the commission, including the recorded debates, and am thoroughly impressed with the extraordinary care and competence which each commissioner brought to the deliberations.

*Comment: Two things are quite clear: one, that the commissioners were severely handicapped by the lack of a definitive statement from this Court as to what standards, in the opinion of the majority, remained to be applied; and two, that the broad principle of representation, "as nearly equal as practicable", when unaccompanied by specific per-*

*missible antigerrymandering standards, makes for infinite possibilities in the way house and senate districts may be formed; witness that each set of partisans, while using the same broad criteria, produced plans which were quite unsatisfactory to each other. Although partisanship was disavowed by several commissioners, Commissioner LaPorte candidly acknowledged the following: "I honestly feel that every amendment proposed on the other side, I am talking for myself, how I honestly feel, had your own political considerations involved. And, as far as that is concerned, I would probably say the reverse is true."*

The record shows that the apportionment commission met in formal sessions on November 12th, 19th, 24th, and December 3d, 10th, 16th, 17th, 22d, 23d, 29th, 30th, 31st, in the year 1965, of course. A number of apportionment plans and amendments were introduced by the various commissioners but none was able to muster the support of a majority of the eight commissioners. The commissioners started out in their November 12th meeting by disagreeing in principle as to how new plans were to be formulated. The Republican commissioners urged that districts be drawn on the basis of a predetermined ratio of the largest district to the smallest district; Democratic members pointed to *Roman* v. *Sincock,* 377 US 695 (84 S Ct 1449, 12 L ed 2d 620), as holding that any such mechanical approach to apportionment is unconstitutional. The Democratic commissioners insisted that population was the overriding guideline, while acknowledging that any plan ought to cross as few political subdivision boundaries as possible and also that district composition ought to be as compact and as regular in shape as possible.

Despite this disagreement, however, the respective partisans started, in earlier commission sessions, to develop and present plans which followed the broad principle of *Reynolds* v. *Sims, supra.* Both sets of partisans submitted plans which to some degree sought to improve upon the existing Austin-Kleiner alternate plan already in effect. None, however, was able to achieve the desired majority vote, not even an amendment designed to cure a mechanical error in the computation of population in existing house of representative districts No. 87 and No. 88.

The Republican members of the commission then returned to their position of advocating a formula with a predetermined ratio of maximum variation between the smallest and largest districts. They introduced the so-called "5% plan", which is officially labelled Michigan senate plan No. 5 and Michigan house plan No. 5. Both house and senate plans substantially reduce the number of county lines crossed while substantially increasing the population disparities between districts, compared with the Austin-Kleiner alternate plan now in effect. The Democratic members of the commission then countered with senate plan No. 6 and house plan No. 6, which had a predetermined ratio of population deviation amounting to 15%. Although plan No 6 was introduced by Democratic members for discussion purposes, it was not supported by the votes of the Democratic membership. They labelled it unconstitutional, pointing to the wide population disparities between districts. They say that the plan was offered merely to show what could be done if a predetermined ratio was used with the purpose of maintaining county boundary lines as the prime object. In senate plan No. 6, *none* of the 83 county boundary lines was breached, and in the house plan only *three* out of 83 county lines were breached.

Compared with Republican plan No. 5, this was said to be a big improvement.

*Comment: The game of thrust and parry was underway.*

Even after the secretary of State had reported to the Court that the apportionment commissioners were unable to agree upon a plan, Democratic Commissioners Brown and Dongvillo countered the Republican 5% plan with a 5% plan of their own which crossed one fewer county line in the senate formula and two fewer lines in the house plan.

*Comment: It was clearly apparent then that using broad criteria, partisan possibilities are numerous.*

Returning now to the proceedings at the apportionment commission level between November 2d and December 31, 1965, there was also presented a plan by Commissioner Brucker identified as plan No. 7, which was introduced at the instance of an organization known as the Civic Searchlight of Detroit which plan improved upon the present plan somewhat by further minimizing population variations between districts, but the plan breached far more county lines than does the existing Austin-Kleiner alternate plan, and severely scrambled districts in the metropolitan areas. It was suggested that the plan also had partisan motivation.

*Comment: The writer has reviewed with great care the offerings and the deliberations of the commission on remand. The general recitation presented immediately above, along with the debates recorded on electronic tapes, reflect most clearly the need for a constitutional rewriting of the apportionment formula for both house and senate with the one-man one-vote principle of* Reynolds v. Sims *as the keystone. In the surcharged atmosphere of the partisan political process, what is most evidently*

*needed is a formula with reasonable specificity, allowing what Commissioner Hanna refers to in the debates of the commission as "limited discretion" in the apportioning body. This "limited discretion" could be accomplished by writing into the apportionment formula what has been referred to as "antigerrymandering standards" as well as other provisions for election convenience. However, it is to be clearly understood that no such standards or provisions could be in substantial derogation of the oneman one-vote principle. See the discussion of permissible deviation in* Reynolds v. Sims, supra, *and the discussion of* Reynolds *in my opinion of last November, 376 Mich 470.*

We return to our narrative at the point where the secretary of State in his capacity as secretary of the commission on legislative apportionment, reported to the Court, pursuant to the order of November 2d, that the apportionment commission "was deadlocked and unable to agree upon a plan" at the end of the Court-ordered 60-day work session. This report was filed on January 4, 1966. Since that time, the Court has received every conceivable type of pleading and counter-pleading from petitioners Badgley, *et al.,* from intervening defendants Scholle, *et al.,* from the Republican apportionment commissioners and the Democratic apportionment commissioners, and others. It is trite but true to say that "the Court has been fully advised in the premises." The following is an abbreviated chronicle of significant docket entries in this proceeding, No. 50,999, occasioned by the electors' suit instituted by petitioners Badgley, *et al.,* and occurring after the December 31st deadlock:

1. January 4, 1966: a "statement of Republican members on report of deadlock", in which said members reiterated support of their 5% plan and blamed

the Democratic members for failing to reach agreement on a plan.

2. January 8, 1966: a reply by Democratic commission members giving their version of why the commission failed to agree, including an item-by-item enumeration of compromises offered to opposition members. Said commissioners asked that the electors' petition be dismissed.

3. January 10, 1966, a brief was filed on behalf of intervening defendants Scholle, *et al.*, insisting that the 5% plan offered by the Republican commissioners is unconstitutional because it is arbitrary insofar as it uses a mechanical formula, and also that the population disparities are excessive. The brief then alleged and attempted to show that the plan was gerrymandered.

4. January 11, 1966, Republican members of the apportionment commission filed an answer to the "statement" of the Democratic members previously filed. The statement denied the charge of bad faith and pointed out that not only had they submitted a plan with minimum boundary crossings but that they had also submitted plans, earlier in the sessions, which came closer to the principle of population equality than does the existing plan. It was reiterated that the present plan has at least *three* districts which are badly gerrymandered.

5. January 12, 1966, the Court met in special conference and by majority vote finally denied petitioners' request for discovery and for oral argument; also, we ordered up from the secretary of State's office all of the "proceedings and records of the commission on legislative apportionment."

Then in the most significant vote of the day, a motion was made that the present Austin-Kleiner plan be declared unconstitutional. The following is a direct quotation from Court minutes of the day:

"Motion was made by Justice O'Hara, supported by Justice Dethmers, that the Court hold the Austin-Kleiner plan unconstituitonal and offensive to the 1963 State Constitution. Nays: Chief Justice T. M. Kavanagh and Justices Black, Smith, Adams, and Souris. Yeas: [Justices] O'Hara, Dethmers, and Kelly. Motion not carried."

6. January 14, 1966. In an amended statement, the Democratic apportionment commissioners charged that the Republican-offered plan No 5 was badly gerrymandered and offered such "distorted shapes" as a "boot-shaped" district and an "arrow-shaped" district and an "angleworm line" dividing one of the counties. The statement made the assertion that the Republican members were attempting to gain an "even greater partisan advantage."

7. January 15, 1966. A brief was filed on behalf of petitioners Badgley, et al., replying to the brief of intervening defendants Scholle, et al. This brief followed the basic position of the Republican commissioners by pointing to a number of apportionment cases throughout the country in which disparities not exceeding 5% had been court-approved. Further, the brief urged adoption of the Republican sponsored plan No 5, and in the alternative asked the Court to adopt some one of the other plans before it in the place of the existing plan which the petitioners attacked in the first instance.

8. January 19, 1966. The Republican apportionment commission members replied to the "amended statement" of the Democratic commissioners in which they denied that plan No. 5 was gerrymandered for partisan advantage or that their plan No. 5, the so-called "5%" plan, contained a mechanical standard of population inequality.

9. January. 21, 1966. Democratic apportionment commissioners Brown and Dongvillo offered a Democratic version of a 5% plan, in which they alleged

that the Republican 5% plan was gerrymandered
but that the Democratic 5% plan was not. They
did not ask the Court to adopt their 5% plan, but
said simply that it was an improvement over the
Republican 5% plan.

10. January 28, 1966. The intervening defend-
ants filed a reply brief in which it insisted that the
Republican 5% plan was clearly and obviously
gerrymandered for partisan advantage and sought to
demonstrate this proposition by a brief analysis of
some of the districts included in said plan. They
asked that we reaffirm the validity of the existing
plan under which the legislature was elected in 1964.

11. February 1, 1966. A rejoinder brief was filed
in behalf of petitioners Badgley, *et al.*, countering
certain assertions made in the reply brief of inter-
vening defendants. The rejoinder brief reiterated
support for the Republican 5% plan and in the
alternative the Democratic 5% plan offered by Com-
missioners Brown and Dongvillo.

12. February 1, 1966. Republican apportionment
commissioners filed an answer to the statement and
offering of Democratic Commissioners Brown and
Dongvillo. They pointed out that the Democratic
plan was never submitted to the apportionment
commission prior to its December 31, 1965, adjourn-
ment. Republican commissioners said that they
"welcome their filing" a 5% plan "although it fails to
do what it claims for it, and contains a number of
significant gerrymandered districts." The statement
then contains a lengthy analysis of the Brown-
Dongvillo 5% plan, in which it is contrasted un-
favorably with the Republican 5% plan. The state-
ment was concluded with the repeated urging that
the Court adopt the Republican 5% plan.

13. February 1, 1966. A "petition to intervene
or in the alternative to appear amici curiae" in which

certain parties sought to intervene and reintroduced plan No 7, referred to in apportionment commission proceedings as the Civic Searchlight plan.

14. February 1, 1966. Justice Black filed a "memorandum", which was released to the public that day. Among other things, it contained a suggestion for removing one of the apportionment commissioners from further consideration of the matter by the drawing of lots. It was also suggested that in the event the commissioners then failed to agree on a "final" plan that they might be held in contempt and assessed heavy fines. No comment is necessary or desirable. The memorandum must be read to be fully evaluated.

15. February 4, 1966. A response of intervening defendants to the petition to intervene or to appear as *amici curiae* was filed. Said intervening defendants objected to intervention but agreed to the appearance of the parties as *amici curiae*.

16. February 9, 1966. A petition to intervene or in the alternative to appear as *amici curiae* was denied by this Court.

17. February 10, 1966. Republican apportionment commissioners filed a pleading to correct errors appearing in previously filed pleadings.

18. February 21, 1966. Republican apportionment commissioners issued a "supplementary statement" claiming that the order of the Court majority dated November 2, 1965, "wiped the slate clean", that is to say, erased the existing Austin-Kleiner alternate plan under which the present legislature was elected in 1964. The Court was again urged to adopt the Republican 5% plan.

*Comment: Nothing is clearer from the above review of the offerings of petitioners Badgley, et al., and the Republican apportionment commissioners, on one side, and intervening defendants Scholle, et*

*al.,* and the Democratic commissioners, on the other,
that there is an amazing rapport in the positions of
the groups constituting the respective "sides" in-
dicated above. All of their pleadings, repleadings
and arguments are in substantial support of one
another. The Republicans want change, preferably
to their own 5% plan. The Democrats would keep
the present plan, but just in case the Court is in-
trigued by the 5% argument then the Democrats
offer their version of a 5% plan. This again shoves
the Court into the unenviable position of appearing
to decide between 2 sets of partisans, no matter what
the clearly overriding legal principles. Small won-
der the late Mr. Justice Frankfurter expressed him-
self in Baker *v.* Carr, *369 US 186, 266 (82 S Ct
691, 7 L ed 2d 663),* as wanting no part of this "politi-
cal thicket."

## DECISION.

### I

As already indicated, our views as to the vital
issues raised by petitioners in this electors' suit
were substantially dealt with last November when
the Court majority remanded the matter to the com-
mission. We reiterate and readopt here and now
the views set forth in that opinion, 376 Mich 470.
In addition, several events have transpired which
require some comment.

### II

Of major significance is the vote taken on the
present plan by the Court at a special conference,
January 12, 1966, called for the primary purpose of
considering what to do about apportionment, in the
wake of the commission stalemate. This portion of
the Court minutes has been cited above and is re-
quoted here for emphasis:

"Motion was made by Justice O'HARA, supported by Justice DETHMERS, that the Court hold the Austin-Kleiner plan unconstitutional and offensive to the 1963 State Constitution.

"Nays: Chief Justice T. M. KAVANAGH and Justices BLACK, SMITH, ADAMS, and SOURIS.

"Yeas: [Justices] O'HARA, DETHMERS, and KELLY. Motion not carried."

The minutes were officially approved by the Court at the February 8th conference. Now, the "Austin-Kleiner Plan" referred to in the minutes is the present apportionment plan approved by the Court in June, 1964 (373 Mich 250), under which the present legislature was elected in November, 1964. There is some suggestion in the opinion of Justice DETHMERS that the present plan has been measured by this Court only in terms of Federal constitutional requirements of the equal protection clause as construed in *Reynolds*. There are two reasons why this is not correct. First, in the June, 1964, decision establishing the existing plan, the opinions subscribed to by at least 5 Justices recognized the existing plan (Austin-Kleiner alternate) as the plan which most accurately complied with constitutional requirements as construed in *Reynolds*. The language of the opinion by Chief Justice T. M. KAVANAGH is clear:

"While it is not possible to develop detailed constitutional requirements, there can be no question as to the overriding requirement—'districts, in both houses of its legislature, as nearly of equal population as practicable.' The Austin-Kleiner alternate districting and apportionment, filed with this Court on May 11, 1964, *most nearly complies with said constitutional requirement.*" (Emphasis added) 373 Mich 254.

The Chief Justice was joined in this opinion by Justices BLACK, SMITH, and ADAMS. In a concurring opinion, Justice O'HARA accepted the principle of "equality of population as nearly as practicable" as the "pre-eminent" test. Justice O'HARA said this was the "only existing guideline." 373 Mich 255. The import of all this is that under the supremacy clause of the Federal Constitution,* the interpretation of the requirements of the equal protection clause of the Fourteenth Amendment, as construed in *Reynolds,* were "written in" to our own Constitution as if there in the first place. The "constitutional requirements" test contained in paragraph 7, section 6, article 4; of the Michigan Constitution of 1963, of necessity includes relevant Federal constitutional requirements. Where Federal and State constitutional requirements are in harmony, they must be construed and applied together. Where in disharmony, the Federal requirements are overriding. In the proceeding before us, the overriding Federal requirement of population equality was and is the prevailing State constitutional requirement. Hence, the present plan has been adequately measured.

A second reason why Justice DETHMERS is not correct in his appraisal is founded in the minutes of January 12th, quoted above. If there were ever any doubt about Austin-Kleiner alternate having met relevant State constitutional requirements, even assuming that they are severable, then this notion was dispelled by the 5–3 vote of January 12th, as quoted. Although the vote was negative on a motion to declare Austin-Kleiner "unconstitutional and offensive to the 1963 State Constitution," when this Court says that a matter is not unconstitutional, this necessarily means that it is constitutional. There is no middle ground.

---

* US Const, art 6, § 2.—REPORTER.

## III

In his opinion, Justice Dethmers also places the stamp of approval on the 5% plan offered by the Republican apportionment commissioners. Although nothing else is properly before the Court without it *first* having found that the present plan "fails to comply with the requirements of this Constitution," as that phrase has been construed, nevertheless, we would not let the moment pass without some comment on the percentage plans based upon assumed mathematical formulae. We think that neither the Republican nor the Democratic 5% plan can meet the constitutional tests set forth in *Reynolds* and also applied in *Roman* v. *Sincock,* 377 US 695 (84 S Ct 1449, 12 L ed 2d 620). In the *Roman Case,* the Supreme Court of the United States unequivocally disavowed the mathematical standards which both Republican and Democratic versions of a 5% plan clearly seek to implement. In that case, the lower court "suggested that population-variance ratios smaller than 1–1/2 to 1 would presumably comport with minimal constitutional requisites." See footnote 21, page 710, *Roman* v. *Sincock, supra.* As to that issue, the Court had this to say:

"In our view the problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a State legislative apportionment scheme under the equal protection clause. Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."

This language is entirely applicable to the two 5% plans as well as to the Democratic 15% plan. Neither can pass constitutional muster, not alone because of mathematical rigidity of formulae, but, also, because of gross population disparities between districts, a matter clearly evident from the record and discussed, in part at least, in the current opinion of Justice SOURIS.

Nor can either 5% plan claim any virtue with respect to partisan gerrymandering. Both have districts which are oddly shaped and what is clear from apportionment commission records is that such are neither accidental nor unavoidable. However, as to the limits of review on the question of gerrymandering, see a discussion of *WMCA, Inc.,* v. *Lomenzo,* 382 US 4 (86 S Ct 24, 15 L ed 2d 2) in my November opinion, 376 Mich at pages 477, 478. We would specifically reaffirm the position taken therein.

## IV

The question has been raised as to whether the present plan is a "final" plan reviewable under paragraph 8 of section 6. Justice SOURIS has dealt lucidly and comprehensively with this issue in his current opinion and we are heartily in accord with his reasoning and with his conclusion that the plan is a final plan.

## V

Finally, we concur in all other portions of Justice SOURIS' current opinion not already mentioned and to the extent that his opinion is not in conflict with this opinion or with my opinion of last November (376 Mich 470). We perceive only minor differences in our approaches based primarily upon differences

in points of departure occasioned by his prior writings. We are, therefore, in accord with the language of his final paragraph which would correct the minor error in the existing plan and hold, if that is necessary, that such corrected plan complies with all Federal and State constitutional requirements. We concur further that such plan is to be followed in the 1966 elections "and thereafter until the next decennial reapportionment or as otherwise may be required by constitutional amendment." As previously held in my November opinion, we would dismiss the petition, without costs.

T. M. KAVANAGH, C. J., and SOURIS, J., concurred with SMITH, J.

---

ORDER OF April 6, 1966.

This matter having been brought to this Court on plaintiffs' petition and defendants' answers, and the pleadings of various apportionment commissioners, and the briefs and arguments of respective counsel, all having been duly considered by the Court and due deliberations had thereon, and this being a proceeding within the original jurisdiction of the Court and the Court being divided as to disposition, it is ordered that the petition be and the same is hereby dismissed. It is further ordered that no costs be awarded herein.

SOURIS, J. I concur in dismissal, four justices (the Chief Justice, Justices SMITH, ADAMS, and I) having

concluded that the Austin-Kleiner plan complies with all Federal and State constitutional requirements and that the petition should be dismissed, three justices (Justices Dethmers, Kelly, and O'Hara) having concluded that the Austin-Kleiner plan should be declared unconstitutional and should be remanded to the legislative apportionment commission for further action, and one justice (Justice Black) having concluded to abstain from decision herein (see 377 Mich 396 at 416).

Justices Dethmers, Kelly, Black, and O'Hara record opposition to entry of an order dismissing this proceeding on the ground that it does not command a majority vote of the Court.